```
 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF TEXAS

 3                       HOUSTON DIVISION

 4   ARC LPW I, LLC,                    .
                                        .
 5                 Plaintiff,           .
                                        .  Civil Action
 6   VS.                                .  No. H-21-CV-926
                                        .
 7   KLMKH, INC.,                       .  Houston, Texas
                                        .  April 26, 2021
 8                 Defendant.           .  9:01 a.m.
 9   . . . . . . . . . . . . . . . . . .

10           TRANSCRIPT OF PROCEEDINGS HELD REMOTELY

11            BEFORE THE HONORABLE KENNETH M. HOYT

12                     TELEPHONE CONFERENCE

13   APPEARANCES:

14   FOR THE PLAINTIFF:

15           Mr. Benjamin J. Sitter
             MC GUIRE WOODS, LLP
16           Tower Two-Sixty
             260 Forbes Avenue, Suite 1800
17           Pittsburgh, Pennsylvania 15222
             412.667.6000
18           bsitter@mcguirewoods.com

19   FOR THE DEFENDANT:

20           Mr. Andrew Lewis Kramer
             ANDREW L. KRAMER, LLC
21           201 St. Charles Avenue
             Suite 2504
22           New Orleans, Louisiana 70170
             504.599.5623
23           FAX:  866.667.3890
             akramer@kramerllc.com
24
          PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS REMOTELY,
25        TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
```

```
 1   COURT REPORTER:

 2           GAYLE L. DYE, CSR, RDR, CRR
             515 Rusk, Room 8004
 3           Houston, Texas  77002
             713.250.5582
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS
 2                      April 26, 2021
 3            THE COURT:  Good morning.  This is Ken Hoyt.  Let me
 4   do a role call; and then, I'll try to take up the matter that we
 5   have before me.
 6                  This is ARC LPW versus KLMKH, Cause Number
 7   21-926.
 8                  Who's on the line for ARC?
 9            MR. SITTER:  Your Honor, this is Ben Sitter from
10   McGuire Woods on behalf of ARC.
11            THE COURT:  All right.  Just yourself, Mr. Sitter, for
12   the Plaintiff?
13            MR. SITTER:  Yes, your Honor.
14            THE COURT:  Okay.  And who's on the line for the
15   Defendant?
16            MR. KRAMER:  This is Andrew Kramer, your Honor, on
17   behalf of KLMKH.
18            THE COURT:  Just yourself on the line for the
19   Defendant, Mr. Kramer?
20            MR. KRAMER:  Yes, your Honor.
21            THE COURT:  Okay, very good.
22                  The proceedings are being recorded by our court
23   reporter, so I want to make sure that we cover the issues that
24   need to be addressed here.  This is the Plaintiff's motion for
25   appointment of a receiver and for a preliminary injunction, so
```

09:01:15
09:01:35
09:01:43
09:01:54
09:02:12

1  I'd like for the Plaintiff to give me a two-minute statement as

2  to why the motion and what the anticipated evidence might be

3  because a preliminary injunction hearing would require some kind

4  of testimony; and we need to have some sense of what that is

09:02:43  5  about, as well.

6              So, if you would at this time, go ahead and state

7  for the record what your understanding or what your appreciation

8  of the, let's call it, emergency of sorts might be,

9  Mr. Sitter.

09:03:03  10          MR. SITTER:  Yes, your Honor.  Thank you.  I'm happy

11  to give you some background on the parties' relationship, if

12  that would be helpful, or I can move forward.

13          THE COURT:  No.  Certainly, you can do that.

14          MR. SITTER:  Okay.  So, at issue, your Honor, is

09:03:15  15  what's called a volumetric production contract which provides

16  that my client gave KLMKH over $3.4 million in return for a

17  promise that KLMKH would produce oil on a monthly basis at

18  certain preset amounts over a five-year period.  And the

19  delivery of that oil could take the form of the oil itself or

09:03:38  20  the cash value of the oil at the date that the delivery was due.

21              As part of the parties' agreement, my client

22  negotiated a number of protections and safeguards to protect its

23  interest.  One of those is the appointment of a receiver, which

24  is the relief we are seeking through our motion.  So, that is

09:04:00  25  expressly provided for, that in the event of a default, my

1    client has the right to appoint a receiver.

2              There are also more drastic remedies provided for

3    in the contract.  Essentially, it provides my client the right

4    to enter the premises and start selling assets without prior

09:04:21    5    notice or Court order.  That is not what we are trying to do.

6    We are trying to have a third party -- neutral third party take

7    over operations to increase production and preserve the asset.

8              Some of the other protections were direct deposit

9    of the oil production payment into an escrow account that my

09:04:36    10    client controlled and also security interest in all of KLMKH's

11    assets.  So, that's the contract.

12             Last summer, KLMKH fell behind on its payments;

13    and as an accomodation, the parties worked through an amendment

14    to the agreement to reset some of that production schedule,

09:04:56    15    basically, to give them more time and also to set a schedule for

16    them to make payments to ARC and make up what was already past

17    due at that point.  However, KLMKH quickly fell behind on those

18    payments under the new schedule and the makeup payments that

19    were supposed to make up for that.

09:05:15    20             So, in November of last year, my client sent a

21    notice of default.  The parties then spent several months trying

22    to see if there were any alternative arrangement or alternative

23    sources of funding that KLMKH could turn to to pay its

24    obligation.  Those were ultimately unsuccessful.

09:05:34    25             And as part of those conversations, the parties

1   agreed to have Mr. Davie Minyard go evaluate the current status

2   of the oil field and its operation.  He has something like 45

3   years of experience in oil and gas operations.

4                 He did his evaluation in March.  There were a

09:05:55   5   number of findings that were troubling to my client, which are

6   detailed in our opening papers, so I won't go through all of

7   them; but they include safety and health and environmental risks

8   and then revelations that oil production was not as we

9   understood it was supposed to be and a number of other issues

09:06:16   10   detailed more in our papers.

11                 I think I need to note here that, during the

12   course of the parties' relationship, my client has been told

13   many, many times by KLMKH that they have a plan.  They have a

14   plan to increase production and get payment going, and that just

09:06:32   15   has never happened.

16                 So, after Mr. Minyard completed his report in

17   mid-March, that's when my client saw the urgent need to act

18   quickly to preserve the value of the assets and filed the

19   lawsuit and then this motion.

09:06:53   20                 So, one of the things that occurred subsequently

21   was in its opposition KLMKH made some of the same

22   representations we've heard before regarding a plan for

23   production but, also, in our view, inflated production numbers

24   or ones that were very surprising for us to read; and part of

09:07:12   25   that is because the way the contract is structured, any

Gayle Dye, CSR, RDR, CRR - 713.250.5582

7

1 production payments are supposed to go into a bank account that

2 is an escrow account controlled by my client to give them

3 visibility into what money is coming in and some control over

4 how that money is used to ensure its use consistent with the

09:07:33  5 contract.

6           So, upon reading the opposition, my client was

7 surprised and reached out to the oil marketer who is the one who

8 actually picks up the oil and sells it and handles the deposit

9 of the proceeds from those sales.

09:07:52 10           They're called Maclaskey; and Maclaskey advised

11 us that the production numbers were much, much lower than what

12 have been represented by KLMKH in its papers and, further, and

13 of a lot of concern, is that Reuben Burton who is, I believe,

14 the former CEO of KLMKH and the man who's on the operator's

09:08:16 15 licenses that they use has contacted the oil marketer in

16 mid-March to tell them the KLMKH contract with ARC had been

17 satisfied, quote, unquote, and then directed Maclaskey to stop

18 having funds deposited into the escrow account and, instead,

19 have them deposited somewhere else.  I don't know where but to a

09:08:41 20 different account.

21           So, that's kind of the relevant background in my

22 view.  In terms of the arguments that we raised, your Honor, the

23 first one has to do with the nature of the parties' contract and

24 the default at issue.  So, the contract is clear that, if

09:09:00 25 there's a default, my client can appoint a receiver.

1          My reading of the papers, I do not believe that

2   KLMKH is disputing that it's in default and makes it very clear

3   about that.  And so, in our view, there really is -- all we are

4   seeking is the enforcement of the provisions that are at issue

09:09:18  5   in the contract that say that we can appoint a receiver; and we

6   are just coming to the Court and saying they have defaulted,

7   they admit they defaulted, they admit that the provisions are in

8   the contract and don't appear to dispute them.

9          So, I'm not -- I don't believe that there's more

09:09:34  10   analysis that's really required than that for the appointment of

11   a receiver.  We've also cited several cases in our papers which

12   I'm happy to point you to where Courts have held that where you

13   have a contract like ours where a receiver can be appointed and

14   the parties agree to that in advance that that's enforceable;

09:09:53  15   and they have enforced those kind of provisions.

16          THE COURT:  A couple of questions -- go ahead, I'm

17   sorry.

18          MR. SITTER:  No.  I'm sorry, your Honor.  Go ahead.

19          THE COURT:  No.  I don't want to necessarily discuss

09:10:06  20   the paperwork -- I mean your motion -- the terms of the motion

21   -- not the terms, should I say, but the argument in your motion

22   because I've gone through it; and I'll go through it again.

23          What I do -- let me ask you this:  Where is the

24   field located or is it --

09:10:22  25          MR. SITTER:  It's in Kansas.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. KRAMER:  All the wells are in Kansas, your Honor.

2          THE COURT:  In Kansas, State of Kansas.  All right.

3               And I think I heard you say that -- that there

4    was some concern as to whether or not there is a market for the

09:10:44   5    product or are you saying that the market is there but the

6    production itself is not there, which -- which or both?

7          MR. SITTER:  It's sort of both, your Honor.  The way

8    that assets are valued --

9          THE COURT REPORTER:  Is this still Mr. Sitter?

09:11:04  10          MR. SITTER:  It is.

11          THE COURT:  Go ahead.

12          MR. SITTER:  The way that assets are valued in today's

13   market is directly correlated to the current production of the

14   field.  So, while there may be substantial reserves on the

09:11:18  15   field, that is not something that is factored in or that is

16   deeply, deeply discounted when valuing assets for purposes of

17   sale in today's market.

18          THE COURT:  Well, does the production -- what did you

19   call them, the production -- or the evaluator -- let's call them

09:11:39  20   that for lack of a better term for me.  When the evaluation was

21   done of the field and the production, I gather, are you telling

22   the Court that he or his firm is concerned about the evaluation

23   -- concerned about the -- what's in the ground?

24               In other words, is he saying there's not enough

09:12:02  25   in the ground to cover this note or is he saying that the value

1  of what is in the ground will not meet the note or he believes

2  it's in jeopardy in some way?  Maybe you can address some of

3  that.

4          MR. SITTER:  Sure.  I think, again, the focus is on

09:12:18  5  the production because that is, generally, how asset value is

6  accomplished.  That said, we don't have clear visibility for the

7  recordkeeping and evidence that we've seen so far as to what

8  those reserves may or may not be.

9          With that said, I believe that it is our -- or it

09:12:39  10  is Mr. Minyard's concern and, obviously, that of our client that

11  there are significant liabilities that KLMKH is exposed to by

12  virtue of the current condition of the field.

13          THE COURT:  In other words, there are liabilities

14  other than this note that they're concerned about?

09:12:59  15          MR. SITTER:  Correct.  That are likely to arise under

16  current conditions.

17          THE COURT:  But your contract is associated not with

18  the land itself but with the production from the land?

19          MR. SITTER:  Yes, your Honor.  It is in terms -- in

09:13:16  20  terms of production to be delivered.  It is backed by security

21  interests which are usually the leases themselves and whatever

22  other assets KLMKH may have, but the lease is on the land.

23          THE COURT:  And the problem -- are you concerned about

24  the leases expiring, anything of that sort, or being in

09:13:35  25  jeopardy?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1      MR. SITTER:  We are, your Honor.  So, Mr. Minyard,

2  when he spoke with the employees onsite, they told him that

3  there were already leases that -- that KLMKH no longer has or

4  that have lapsed; and that -- I'm sorry, your Honor.

09:13:55   5      THE COURT:  All right.  Let me ask Mr. Kramer if he

6  wants to respond to those concerns.  And go right ahead.

7      MR. KRAMER:  Yes, your Honor.  Yes, your Honor.

8  Andrew Kramer on behalf of KLMKH.

9          And this contract was originally entered into --

09:14:11  10  or this loan was done shortly before COVID, I think in February

11  of 2020 when it was entered to; and obviously, that was a

12  different world at that time.  And the contract -- the loan --

13  and it is a loan.  It's -- there is a promissory note which they

14  did not attach to their original complaint or their motion,

09:14:31  15  strangely enough.

16          I'm not exactly sure why they didn't, but they

17  did not attach that to any of those papers.  It was -- it was

18  being paid back in accordance with this volumetric production

19  agreement, this VPP agreement; and that agreement had certain

09:14:50  20  amounts that -- basically, barrels of oil as they got sold would

21  be paid to -- directly to ARC and to repay the loan.

22          But there are also minimums in the agreement.

23  So, if we didn't hit certain production amounts, then we would

24  have to pay those minimums.  Obviously, after COVID went and

09:15:12  25  kind of started in March of 2020, the market, as we all know,

1   for oil and gas fell through to the floor.

2                Many oil and gas companies have filed bankruptcy.

3   I mean, it's been a disaster for many of those companies after

4   that happened, and it affected KLMKH the same way.  Prices fell

09:15:32   5   through the floor.  We couldn't really make -- basically, we

6   couldn't make the -- our -- pay our -- what it cost to operate

7   the fields after this happened.

8                And eventually, in November, because the

9   production was so low, we had to shut everything down.  All the

09:15:52   10  wells were shut down by November.  So, it had been a process

11  kind of ongoing up to that point; but by November, not a single

12  well was producing.

13                In the summer, they -- ARC and KLMKH had worked

14  out an agreement because KLMKH had missed a few payments; and

09:16:08   15  they worked out an agreement to kind of fold those missed

16  payments into new payments going forward.  So, it wasn't really

17  a reduction of what was owed, it was a way to distribute the

18  past due amounts over time.  That was done in August.

19                But I mean, the company was still, I mean,

09:16:28   20  obviously, having problems getting -- getting what it needed

21  from these wells and getting the prices that it needed,

22  obviously.  In November, it shut down.  We still made all the

23  payments through November.

24                November is when we first went into default; and

09:16:46   25  then, we started trying to negotiate something with ARC; and

1  essentially, from our position, ARC was, basically, trying to
2  take over the company; and we couldn't -- we couldn't acquiesce
3  to that.  The -- and then, ultimately, by March ARC went ahead
4  and filed this lawsuit.

09:17:06
5        The company has now reopened the wells.  It just
6  started in March.  I know they've submitted this affidavit that
7  has, essentially, double and triple hearsay in it; but the --
8  the production has begun.  The wells are starting to open up.
9  We've increased production up to over hundred barrels a day in
09:17:28
10  the last few days.

11        And so -- and it takes awhile for those payments
12  to come through.  It's not an automatic you produce the oil --
13  you produce the oil and a day later you get a payment.  It takes
14  60 -- 30 to 60 days to get all those payments in and -- based on
09:17:44
15  shipping schedules and buying schedules.

16        So, that's just starting to happen now.  The
17  company is not -- doesn't have any problems with leases, doesn't
18  have any -- has -- I mean, whatever issues Mr. Minyard saw out
19  there, we've taken those into consideration and begun making
09:18:05
20  repairs to certain wells.

21        The company doesn't have any other real
22  significant liens against it, doesn't have anybody coming after
23  it, has no intention of filing bankruptcy or anything like that
24  right now.  So, I mean, the company is -- there's no reason for
09:18:19
25  a receiver to be appointed.  We can get back on track, and we

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   are starting to get back on track.  And I mean, whatever is past

2   due to ARC can be worked out.

3              Now, the major issue I see in this case is the

4   fact that they've never identified how much is owed by KLMKH to

09:18:38   5   ARC in any of the pleadings.  Even today -- in the last one they

6   filed on Friday, they still don't identify that.  Is it a dollar

7   or is it $5 million?  It's unclear what they're -- what they're

8   going after.

9              And it seems like they're going after the monthly

09:18:51   10  payments because they want to keep the contract in effect

11  because that's more profitable to them to have that contract in

12  effect.  Rather than declare it in breach and advance all the

13  payments owed under it, it's much more profitable to keep those

14  monthly payments coming in.

09:19:08   15             But it's still unclear what they're looking for.

16  So, I mean, I don't see how you appoint a receiver when your

17  Honor doesn't know if it's a dollar or $4 million that's owed.

18             THE COURT:  Well, let me break in here just to ask a

19  couple of questions.  I'm sure that's not at issue ultimately

09:19:27   20  because the note itself determines what the payments are, and

21  that's already been renegotiated, and I'm sure there's some

22  numbers from last year that will define that.  So, that's not my

23  concern in light of the motion and the -- the motion for

24  preliminary injunction and for receiver.

09:19:48   25             What I am concerned about -- what I would be

1   concerned about, as I look back at these -- at the papers, is

2   not just simply whether or not there is production because I

3   suspect that by July a lot of these companies are going to be up

4   and going.  There's probably going to be a lot of gas moving --

09:20:12   5   fuel moving this summer with people wanting to really get out on

6   the highway.  So, I suspect there is -- there's not a problem

7   there.

8              One of the questions that I have, though, for you

9   is whether or not the market that you have relied upon -- your

09:20:28   10   client has relied upon in the past is still there.  In other

11   words, are you just going on the open market or do you have a

12   particular customer that you're working through?

13              MR. KRAMER:  We have a particular customer that we're

14   working through, and there's no issue.  They've been -- they

09:20:47   15   have been purchasing the oil that we're producing now.  It just

16   -- I mean, it takes -- maybe the whole process takes 30 to 60

17   days to get paid off of those.

18              THE COURT:  No.  I get that.  I get that.

19              MR. KRAMER:  Yeah.

09:20:59   20              THE COURT:  The other question --

21              MR. KRAMER:  So, it just -- just started in March.

22   The production just reopened in March, so it's only be a few

23   weeks.

24              THE COURT:  Well, and certainly, anyone with a

09:21:10   25   long-term payout -- I say "long term," whatever the payout might

1    be on the note -- would not be interested in collecting

2    necessarily the money but the money plus the interest because

3    that represents their profit above and beyond the dollars that

4    were laid out.

09:21:27    5              So, there are, apparently, costs now that are

6    being generated because you're back in production, let's say;

7    and the question that I'm concerned about is -- is the -- is why

8    the CEO would divert the funds to a separate and different

9    account unless he is attempting to pay other people above and

09:21:52   10    beyond or in front of; and I'm not suggesting he shouldn't or

11    should.

12              But I mean, it seems that he's trying to put

13    somebody in front of ARC in terms of the obligation.  So, why --

14    he's -- this is kind of like a double breach.  You're not only

09:22:12   15    paying, but you're diverting the money that you're receiving or

16    will be receiving to a different account.

17              Is that your appreciation of what is happening

18    with the CEO or do you know or do you have any interest in

19    speaking to that?

09:22:26   20         MR. KRAMER:  Well, I'll tell you this:  I mean,

21    obviously, we just got the memo from them on -- the reply memo

22    on Friday; and that -- when I read it, I immediately got on the

23    phone to find out what was going on.

24              And this is -- my understanding is that there was

09:22:40   25    about $60,000 in production payments that was available, but

1   there were some liens -- I mean, there's -- it's like 50 or

2   $60,000 worth of liens that have to be paid; and it's paid based

3   on certain wells on certain leases.

4            And those liens come out on top before any money

09:22:58  5   goes to -- goes to any account after that.  And so, those liens

6   had to be paid; and they were paid; and they're now down to -- I

7   mean, I think it's my understanding they're down to under

8   $25,000 at this point with these recent payments.

9            There was a little bit left over.  It's not much.

09:23:16  10  It was like in the 20 to $30,000 range, and they had to pay some

11  -- some of the operation costs, but -- and they -- it's my

12  understanding -- it's not that the operator said that it was

13  satisfied.  He's never said that the -- that the agreements

14  between ARC and KLMKH were satisfied.

09:23:35  15           I mean, he may have misunderstood that when one

16  suit was filed that didn't end the obligations and that -- I

17  mean, this money still has to go to the accounts; but --

18            THE COURT:  Well, let me --

19            MR. KRAMER:  Yeah.

09:23:47  20          THE COURT:  Well, let me ask a question:  If money --

21  if the agreement is the money should be going to that account,

22  then, certainly, it should be going to that account.

23            MR. KRAMER:  Yeah.

24            THE COURT:  The question I'm concerned about is

09:23:59  25  whether -- let me ask it this way:  Does ARC have the ability to

1  tap into that account just automatically or does the -- or does

2  it simply flow from -- the funds to them flow from that account

3  in some sort of way according to the note?

4        MR. KRAMER:  The marketer sends the money -- I mean,

09:24:18  5  according to our agreement with ARC, sends the money to a joint

6  escrow account, essentially.  I don't know if it's technically a

7  joint account.  Maybe Ben can talk about that.  But it's an

8  escrow account where then ARC receives those funds from.

9        So, it goes from the marketer to this escrow

09:24:37  10  account.

11        THE COURT:  But ARC can't receive those funds without

12  the approval of the CEO or do the funds -- does the marketer

13  automatically flip the funds into ARC's escrow account so that

14  the escrow then becomes ARC's escrow?  Is that -- is what I'm

09:24:56  15  asking.

16        MR. KRAMER:  It was supposed to be, I think,

17  automatic; and I think it has been automatic to the extent there

18  was production in the last 12, 13 months.  The funds went to

19  that escrow account.  This last change was just, I mean, within

09:25:13  20  a couple of weeks, within the last couple of weeks; and that has

21  been corrected.

22        But still, the liens first have to get paid; and

23  that gets paid before it goes to this escrow account.  Once it

24  hits the escrow account, ARC is -- ARC has authority to remove

09:25:27  25  the funds from that escrow account.

19

1            THE COURT:  That's what I was trying to make sure,

2  that they have the authority without -- without regard for any

3  -- any other debts that might be owed.  Once it hits the escrow

4  account, ARC -- ARC has the say-so, I gather, right?

09:25:44    5            MR. KRAMER:  I believe that's correct.

6                  Ben, is that correct?

7            MR. SITTER:  That's my understanding, your Honor.

8            THE COURT:  All right.  One other question at least:

9  You've indicated in your papers that ARC is fully secured.  How

09:25:59   10  can you say that?  Is that based upon what's in the ground or --

11            MR. KRAMER:  Well --

12            THE COURT:  "Secured" would -- I mean, if there are

13  other debtors and creditors -- people who are owed, certainly,

14  it puts ARC in a position where it would have to get in line or

09:26:15   15  stand behind other people who, as you admit, are ahead of ARC in

16  terms of collection.

17            MR. KRAMER:  There are -- were some minor operator or

18  kind of vendor liens against -- against KLMKH that have been

19  satisfied or on the way to being satisfied shortly.  Nothing

09:26:36   20  major.  It was -- when it started, it was well under hundred

21  thousand dollars; and now, it's probably down to 25 or $30,000

22  at this point.  So, nothing major compared to what ARC is owed.

23            But ARC -- our point is that they're secured --

24  first of all, there is a co-debtor that they have not sued.  For

09:26:54   25  whatever reason, they decided not to sue them or pursue them.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   It's not just that he's -- that entity is a co-debtor and a

2   guarantor; but I mean -- so, that co-debtor is fully obligated

3   for the loan as much as KLMKH is.  And some reason, they haven't

4   pursued that.  I mean -- and maybe they don't want to at this

09:27:16  5   point.  But I mean, they are secured by that co-debtor so that

6   was one issue.

7              And then, the other issue is that -- the assets

8   that the company has.  I mean, the company has -- based on

9   what's -- what -- the evaluation that the -- these wells are

09:27:36  10   worth well over -- I mean, not well over but close to hundred

11   million dollars, so -- total.

12             So -- and this only started out as a three -- I

13   think $3.425 million loan; and now, with whatever interest, it's

14   probably higher than that and whatever fees they would charge.

09:27:52  15   But -- but it's -- but actually, there's -- it was about over --

16   there was over $500,000 paid on the loan already.

17             So, I mean, based on what the company has in its

18   -- in its control, that compared to what's outstanding to ARC, I

19   mean, ARC is fully secured by that.

09:28:12  20             THE COURT:  Well, if the oil is in the ground and it

21   has no real marketable value, then nobody gets anything out of

22   it at this point, whether you got a receiver or not.  You don't

23   have a market for the oil.

24             But let me go back to Mr. Sitter and -- and ask

09:28:33  25   you, Mr. Sitter, what makes you think that by appointing a

1  receiver you get a chance to run this, let's say, oil production

2  matter?  What makes you think that your -- you -- by "you," I

3  mean your company -- is in a position to determine, you know,

4  anything other than what's happening now?

09:28:54  5          Certainly, there's a pecking order.  You have to

6  recognize that -- that you are in second or third place,

7  whatever, behind certain people, the lessors, I guess, in terms

8  of payment, the people in the field who get paid.  What makes

9  you think you'd be able to do anything better than what's being

09:29:15  10 done now?

11          MR. SITTER:  So, a few responses, your Honor.  I'm not

12 sure, first of all, that I agree that we would be second or

13 third in line.  That's not how the contract was drafted.  And

14 so, the way it was provided was very much to make a first in

09:29:31  15 line to ensure that the payments were coming to us first in the

16 escrow account so they couldn't be used for other purposes and

17 to allow, for instance -- as I said, this is not what we're

18 seeking to do.

19          But the contract states and I think it shows that

09:29:48  20 we should be first in line, that upon a default we have a

21 contractual right to enter the premises and just start selling

22 assets.  Now, I'm not seeking to do that.  My client is not

23 seeking to do that.

24          But I think that demonstrates this is not -- this

09:30:01  25 is not a situation in which others are supposed to get paid

1   first.  We're supposed to have --

2          THE COURT:  Well, let me ask you this:  You recognize

3   that the people working in the field who are doing the day labor

4   would be ahead of you, don't you?

09:30:16    5          MR. SITTER:  I'm not sure I agree on that; and also, I

6   don't believe that's what's occurring because --

7          THE COURT:  No.  But I mean, that is the reality,

8   though, isn't it, from the labor perspective?  They would have

9   -- be paid before a contract if this matter were to go sideways;

09:30:33   10   and maybe it's already going that direction, who knows.

11          But wouldn't the laborers be entitled to

12   preference of a contract like yours?  I'm just -- I'm curious as

13   to how that would occur.  How do you pay the people if you don't

14   have the money to pay them?  They're not going to do the work,

09:30:52   15   right?

16          MR. SITTER:  Yes, your Honor.  I'm not sure they would

17   get paid, and that drastic remedy is one reason we're not

18   seeking to go there right now; but it is provided for, is -- if

19   ARC goes on and starts -- goes onto the property and starts

09:31:04   20   selling the assets, there's not going to be anybody to be paid.

21          And as another practical matter, there's --

22   currently, our understanding from Mr. Minyard and all his

23   conversations with those who were there, there's one employee.

24   The rest of them were let go, and he's a water truck driver

09:31:23   25   trying to handle the whole field by himself who does not have

1    the expertise to handle that kind of management.

2              And I apologize, your Honor, I know you had

3    another question you wanted me to address; but I'm --

4              THE COURT:  I'm just curious as to what you would do

09:31:39  5    to put these fields in operation or this field in operation and

6    make it more productive than it is now.  Is there some thought

7    about that based on what you -- your client has seen and made

8    through evaluation?

9              MR. SITTER:  Sure.  So, as a beginning matter, just to

09:32:00 10    level that, my client is not seeking to personally take over the

11    assets or operate them.  We are seeking to have a certified,

12    qualified third party who is neutral and reports to the Court be

13    in charge of those operations.

14              And the source of that desire on our part is not

09:32:20 15    to take over the company, which is not what would occur; but it

16    is our feeling that the company is being very badly managed.  If

17    it is true that there are hundred million dollars in reserves in

18    the field, which I'm not sure has been established -- I don't

19    think it has, so let's assume that it has -- how could it be

09:32:42 20    that a company cannot meet its most basic expenses?

21              Any company being adequately managed with those

22    kinds of assets could satisfy such minimal obligations; and it's

23    not like a missed field here or there, it is the payroll miss

24    for everybody.  It's all of the vendors or many of the vendors

09:33:04 25    not being paid.  It's utility bills not getting paid, and it's

1   my client not getting paid.

2            So, it gives me some very -- I question the sort

3   of opinion of the CEO, which we're not seeing any backup, that

4   the value is actually what it is.  The people that we have

09:33:24   5   recommended as receiver, which are Ankura and GeoCertified, we

6   -- and certainly, if the Court had a different preference, it's

7   fine with my client as long as we have some input into who it

8   is --

9            THE COURT:  No, no.  Here's what my concern is:  If

09:33:42   10   the price of oil is $10 a barrel and you don't have a market out

11   there, it may not matter who is in charge is what, I guess, I'm

12   trying to say.

13            MR. SITTER:  I see, your Honor.  While there was a dip

14   in prices a year ago, oil prices are actually strong.  That's

09:34:00   15   not the issue.  The issue is getting the oil out of the ground

16   and onto market.  That is not happening.

17            THE COURT:  Okay.

18            MR. SITTER:  We're not concerned about being able to

19   sell the oil or what price it will fetch; and in fact, our

09:34:12   20   contract, because its terms -- in terms of production is price

21   insensitive.  What we are owed is dependent on the price of oil,

22   but that has nothing to do with what they are -- they're

23   required to give us, which is the oil itself.

24            THE COURT:  Yeah, yeah.  All right.  I think that what

09:34:30   25   I need to do -- first of all, I want to go back and read your

25

1  documents and take a look at that; and I need to know whether or

2  not what you're proposing and you're saying will not -- will not

3  wreck an operation simply on the threshold of recovery because a

4  lot of companies suffered tremendously during the -- and have

09:34:58  5  suffered and are still suffering during the pandemic.

6  And my concern is what evidence, if any, do you

7  need from me or do I need in order to grant you the request.  Do

8  you think that your papers are strong enough or -- for me to be

9  granting that?  Certainly, not a preliminary injunction.  I

09:35:20  10  think that -- if a hearing is necessary, then we need to look at

11  having a hearing date; and that's where I'm going with this.

12  MR. SITTER:  Sure.  I appreciate the opportunity to

13  address that, your Honor.  As an initial matter, just to speak

14  to the preliminary injunction, it is sort of a

09:35:38  15  belt-and-suspenders approach.  It works hand-in-hand with the

16  appointment of the receiver to ensure that the receiver can be

17  -- can operate without interfering.

18  In terms of what is needed, I think our first

19  argument would be that nothing is needed.  We have a contract

09:35:58  20  that says a receiver should be appointed upon event of default.

21  We have an admission that there's been a default, and we have no

22  -- no argument contesting that the provisions say what they say

23  or are enforceable.

24  So, I think that, based on that alone, your Honor

09:36:15  25  could rule on the papers without a hearing; and we have cited

1 cases in which Courts have done that; and it is within the

2 discretion of your Honor whether you believe a hearing is

3 necessary before ruling on that motion.

4      We have a secondary argument which is the typical

09:36:35 5 general receivership analysis that applies when you don't have

6 the contract provision like the ones that we do.  I don't think

7 your Honor has to get there; but if your Honor believes that

8 that is necessary to -- to rendering a ruling on that, then

9 those are more fact-specific considerations.

09:36:57 10      I believe that our papers address all of them

11 adequately and are supported by competent testimony and evidence

12 on those issues.  So, again, I'd be comfortable with a ruling

13 simply on the papers on that argument, as well.

14      What I would say is that, if there is going to be

09:37:16 15 discovery, if that's something your Honor desires, then we would

16 want it to be mutual.  If we're going to go down that path,

17 then, you know, we should be entitled to it, as well.  I don't

18 think it's necessary, but we would want it to be mutual.

19      And in terms of what we would need, I think it's

09:37:33 20 fairly limited, documents and probably just a couple of

21 depositions; and I think that's something that the parties could

22 accomplish in a month.

23      THE COURT:  Is there a -- let me ask you, then I'll go

24 to -- I'll then go to Mr. Kramer.  Is there a possibility that a

09:37:53 25 receiver could do damage here that would need to be covered by a

1   bond?  And how do you determine what the -- what the reasonable

2   rate is for a person who has been appointed receiver?  Is that

3   addressed in your papers?

4                    I haven't read through them to the end already.

09:38:09   5   I've just looked at them preliminarily and tried to get some

6   sense of how much work I need to do in order to get to the

7   bottom of this.

8                    MR. SITTER:  Sure, your Honor.  So, what we've done is

9   we've submitted a proposed order that's pretty detailed and goes

09:38:24  10   through the rights and responsibilities of the receiver and its

11   reporting obligations of whatever limitations on liability it

12   may have.

13                    For now, the identity of the receiver and the

14   amount to be paid have been left in blank because we proposed

09:38:40  15   two candidates and recognized the possibility -- or your Honor

16   may want a third or different candidate.  But I anticipate the

17   amount would be set by whatever those receivers are quoting as

18   the price for their services.

19                    And we can certainly provide those.  If that's

09:39:00  20   something that your Honor would like, we can get those.

21                    THE COURT:  Yeah, all right.

22                    Do you want to respond to that in any way,

23   Mr. Kramer --

24                    MR. KRAMER:  Yes, your Honor.

09:39:09  25                    THE COURT:  -- other than --

1    MR. KRAMER:  Yes, your Honor.

2    THE COURT:  -- other than the receiver?  It isn't

3  necessary.  But go ahead.

4    MR. KRAMER:  Well, no, no, I won't go over that again.

09:39:15  5  The -- I mean, first of all, there's just, obviously, a lot of

6  factual issues in this matter and many factual issues that were

7  just raised in their reply memo submitted on Friday.

8    In fact, I would really appreciate an opportunity

9  to respond to that reply memo.  I can keep it brief and just

09:39:32  10  respond to the specific facts in there.  So, if that -- if we

11  could have that opportunity to do that, that would be -- that

12  would be great because they did raise new issues in there that

13  weren't raised previously.

14    But there are a lot of factual issues.  They are

09:39:45  15  asking for an injunction.  An injunction requires a hearing.

16  So, unless they're going to withdraw that request -- I mean, I'm

17  not sure we have much of a choice but to have a hearing on that;

18  and at that point, you can have a hearing on the request for a

19  receiver, as well.  I mean, it just -- there are a lot of issues

09:40:06  20  that need to be addressed here.

21    THE COURT:  Well, let me ask on that point -- I

22  believe Mr. Sitter has described this as a belt-and-suspenders

23  kind of circumstance.  If I were to appoint a receiver, would I

24  not want that receiver to be able to -- to manage, for example,

09:40:29  25  the sale and distribution and -- of product as well as the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  management of the finances?  Wouldn't that be something that

2  would just simply be automatic that follows the appointment of

3  receiver and that not be interfered with?

4          The injunction itself doesn't seem to indicate

09:40:56  5  anything except don't interfere with the receiver.  Isn't that

6  what he's asking?

7          MR. KRAMER:  I believe so.  I mean, yeah, as far as

8  the injunction goes; but I mean, if he is asking for injunction,

9  I mean, that's -- I mean, it is required to have a hearing,

09:41:12  10  so -- I would think on a preliminary injunction.

11          So, I mean, yes, I think that could all be done

12  probably within the receivership order.  So, maybe the

13  injunction isn't necessary; but they haven't withdrawn it yet,

14  so -- I mean -- so, I mean, we just got to figure that out; but

09:41:33  15  I mean, there are just a lot of issues that need to be addressed

16  here.

17          I mean, the two licensed -- the two operators

18  they've identified aren't even licensed in the State of Kansas.

19  The one company that is -- the GeoCertified that they say is

09:41:54  20  licensed, actually, their license expired back six months ago.

21  So -- and they can't -- the State of Kansas will not allow a

22  non-licensed entity or individual to be an operator.

23          So, I mean, we've got a -- I don't know how you

24  go forward on that unless we find somebody who is licensed in

09:42:12  25  Kansas; but the other problem is is, once a new operator takes

 1  over, some of these -- some of these farmout agreements or

 2  assignments of the leases that we operate under, they may --

 3  they have clauses in there that allow for the automatic

 4  termination if -- if it's assigned without their authority.

09:42:33    5            And so, an operator -- a receiver could be

 6  considered an assignment; and these -- these farmout agreements

 7  could be canceled which would be disastrous for the company.

 8  So, we -- I mean, we kind of need to be careful of those issues,

 9  as well.

09:42:47   10            I mean, I think there are other alternatives to a

11  receiver that takes over control and operation of the company.

12  I mean, there are receivers that just kind of handle the

13  financial aspects of this all; and that would be kind of a --

14  less of an obtrusive or intrusive alternative, I mean, to this

09:43:02   15  proceeding.

16            So, I don't know.  I mean, I think a hearing

17  would be necessary if we're going for a full receiver and an

18  injunction; and we would request an opportunity to take some

19  depositions.  We need to -- we need to find out more about what

09:43:23   20  Mr. Minyard is saying.

21            He has a long report, and there are many issues

22  that we have with that report.  A lot of the declarations that

23  they -- the one that they just submitted has, as I said before,

24  double and triple hearsay in it; and we need to get to the

09:43:38   25  bottom of some of those issues, as well.

1          THE COURT:  How long -- how much discovery are you

2    talking about and what's the length of time?

3          MR. KRAMER:  No.  I think we can get it done within 30

4    days, as well, as Mr. Sitter said.  I don't -- I mean, I see it

09:43:52   5    being three or four depositions that would take the course of

6    two or three days to get done.

7              I don't think there's any -- I mean, any written

8    discovery that needs to be done.  It would just be depositions

9    that we could take and get done within 30 or 45 days.

09:44:10  10          THE COURT:  Well, do you see anything that would

11    interfere with that?  All of your witnesses that you anticipate

12    -- I don't know, I guess we're talking about two or three

13    witnesses probably at most.  Is there any reason why those

14    people are not available for deposition pretty much, let's say,

09:44:27  15    upon call?

16          MR. KRAMER:  I think they are available.  The people

17    on my side are certainly available.  We will make time to, you

18    know, get this done; and I assume Mr. Minyard would be

19    available, as well.

09:44:44  20          THE COURT:  Would there be a problem, Mr. Sitter, in

21    what I'm -- I'm thinking that -- at least as a part of any

22    solution here, that I need to set a hearing on the scope of work

23    that a receiver needs to be engaged in as well as whether or not

24    -- and that would also define -- if it were -- were an

09:45:07  25    appointment, it would define the nature of any injunctive

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   relief, whether temporary or preliminarily, pending some further

2   date or point of clarification in the -- in the production

3   process.

4                    Is that something that you think you could manage

09:45:33   5   in 30 days?

6            MR. SITTER:  Just so I'm clear, your Honor, the

7   question is whether we can --

8            THE COURT:  Discovery.

9            MS. SITTER:  I'm sorry, go ahead.

09:45:43   10            THE COURT:  Yeah.  Whether you could do discovery in

11   30 days and be prepared to have a hearing.

12            MR. SITTER:  Yes, your Honor.  Yes, your Honor, I

13   believe we can.

14            THE COURT:  So, if I'm going to have a hearing in

09:45:53   15   this, it will be sometime the first of June.  It would be in

16   Houston.  I would not be doing it -- you'd have to jump a plane

17   or whatever is necessary and come in and do it.  I don't believe

18   that that should be a problem.

19                    Is that a problem, as far as you're concerned,

09:46:10   20   Mr. Sitter?

21            MR. SITTER:  It is not a problem for me, your Honor,

22   or counsel, generally, for ARC.  I don't -- it will not be a

23   problem for, at least, one of our witnesses.  I would just ask

24   if the Court anticipates having other witnesses participate in

09:46:28   25   the hearing virtually or remotely or if you would require their

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    attendance in person, as well?

2            THE COURT:  Well, if you take their depositions, some

3    of that could be submitted on the depositions themself.

4            MR. SITTER:  Yeah.

09:46:39   5            THE COURT:  I just don't know how much you want in

6    terms of live witnesses.  And if you've taken the depositions

7    and you're done with that, it may be that none of them needs to

8    appear here in the courtroom; and perhaps, you don't either.

9    You would just simply flip it into a -- into a document

09:47:02  10    indicating what you believe the evidence shows; and I would then

11    consider the paperwork.

12            That's what I'm -- I'm thinking might be part of

13    the way this could be accomplished.  But I'm asking from a

14    deposition perspective could that get done within the 30-day

09:47:21  15    period so that I could have a hearing or papers submitted on the

16    -- on the matter in, let's say, 45 days, if 30 days is provided

17    for discovery?

18            MR. SITTER:  Yes, I do not anticipate a problem with

19    that, your Honor.

09:47:38  20            THE COURT:  All right.

21            And I think I heard the same from you,

22    Mr. Kramer.

23            MR. KRAMER:  Yes, your Honor.

24            THE COURT:  All right.

09:47:45  25            MR. KRAMER:  I think we can get that done.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1              THE COURT:  All right.  Here's what I'm going to do:
 2   I'm going to look at the papers and see if some limited
 3   receivership ought to be appointed.  If so, I'll do it
 4   preliminarily or, at least, temporarily with the understanding
 5   that this matter will be taken up in its full measure on a date
 6   certain the first of June here in the courtroom in Houston, and
 7   we'll go from there.
 8              We'll see how you do your discovery.  I don't
 9   have a way of determining what testimony is necessary.  I don't
10   want to get into a dispute regarding discovery, so I would
11   anticipate that we're looking at two or three witnesses maybe
12   from your side, Mr. Sitter.  Is that right?
13              MR. SITTER:  I think that is right, your Honor.  I
14   would just add that I would like the opportunity to request
15   documents on an expedited basis for potential use in the
16   depositions.
17              I don't anticipate burdensome or copious
18   requests.  There may be some targeted document requests that we
19   have, especially regarding any remedial efforts or some of these
20   safety issues that we've identified, financial records.  So, I
21   would just like --
22              MR. KRAMER:  And we're happy to provide that.  We're
23   not trying to hide anything from them, so --
24              THE COURT:  And that's you, Mr. Kramer, speaking.  So,
25   let me just ask you:  From your side of it, you see no problem
```

09:47:59
09:48:20
09:48:41
09:48:59
09:49:11

1  -- I'm not sure what you might need from the Plaintiff; but

2  those same two or three witnesses, to some extent, would be, at

3  least, one or two of the witnesses that you would be presenting

4  anyway, wouldn't it -- aren't they?

09:49:29  5        MR. KRAMER:  Certainly.  And we would have a

6  representative from our company, maybe one or two

7  representatives but at least one from our company.

8        THE COURT:  Okay.

9        MR. KRAMER:  And so, yeah.  So, we anticipate.  And I

09:49:40  10  don't really see us needing documents from ARC, but we would be

11  -- and we're happy to turn over -- in fact, I think they're

12  entitled to whatever documents we have regarding those wells,

13  so --

14        THE COURT:  All right.  Then, we're talking about a

09:49:53  15  limited basis for discovery so that we are not talking about

16  two- and three-hour depositions or half-day depositions because

17  we're talking about a receiver.

18             And we're not getting into the nuts and bolts of

19  the contract or you might want to stipulate as to some number or

09:50:14  20  stipulate, at least, that there is a financial obligation

21  outstanding as, at least, defined by previous documents so that

22  there's no dispute or argument, let's say, from -- from KLMKH

23  that there's no money due and owing.

24             I don't think that's going to be an issue here.

09:50:37  25  So -- well, let me just see if I can craft an order.  I'll go

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    back through the documents.  I'll give you until Monday a week,

2    Mr. Kramer, to respond to this -- to the reply.

3              MR. KRAMER:  Okay, thank you.

4              THE COURT:  I don't expect any additional documents;

09:50:55   5    and what I mean by that is I'm not -- I'm not inviting,

6    Mr. Sitter, that you then respond to the reply but that you will

7    be moving forward with your depositions, defining promptly the

8    names of persons or titles of persons that need to be deposed;

9    and by agreement of parties -- by "parties," I mean, lawyers --

09:51:19   10   by agreement of the lawyers, the parties will be produced where

11   they should be produced; and I'm not really sure where they are.

12              I suspect they may be in Kansas, so it may be

13   that -- that that's where the depositions ought to be taken.  Is

14   there any concern about that, where they're going to be taken or

09:51:39   15   where the parties are that need to be deposed?

16              MR. SITTER:  No.  I think we can work that out.  I

17   don't think there should be an issue with that.

18              THE COURT:  All right.  And getting --

19              MR. SITTER:  I'm -- I'm sorry.

09:51:51   20              THE COURT:  -- getting the depositions transcribed.

21   And you would -- that was you, Mr. Sitter, speaking at that

22   point, correct?

23              MR. SITTER:  Yes, your Honor.  I was just going to say

24   that it would especially streamline matters to the extent we can

09:52:05   25   agree to do certain depositions remotely if that's something

1    that KLMKH is amenable to.

2              MR. KRAMER:  Certainly.

3              THE COURT:  No problem.

4              MR. KRAMER:  It is.  Yeah, we can do those depositions

09:52:18  5    remotely.  That's not a problem.

6                   And your Honor, let me just say in advance the

7    only date that I'm not available is June 2nd.  It's my

8    daughter's high school graduation.  So, besides that, I'm open.

9              THE COURT:  All right.  We're going to set everything

09:52:29  10   on June 1st then.  All right.

11             MR. KRAMER:  Thank you very much.

12             THE COURT:  Anybody else got anything going on,

13   college, high school, or otherwise, the first two weeks of June?

14       (No response.)

09:52:43  15            THE COURT:  Sometimes these things crop up.  No

16   weddings?  You guys have got -- you guy's are already married or

17   don't intend to anyway, right?

18             MR. KRAMER:  Yeah, I'm married and not planning on

19   doing anything else.  So, yeah.  Yeah, June 2nd is the only day

09:52:58  20   for me that's not good.  But that's it.

21             THE COURT:  I'm just kind of throwing it out there

22   facetiously, but I want to make sure that we're all on the same

23   page that it would -- whatever it is, it's going to be the first

24   two weeks of June; and we'll recognize the June 2nd date as a

09:53:13  25   date that it should not -- nothing should be set on.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. KRAMER:  Thank you very much.

2          THE COURT:  Yeah.  All right.

3               All right, gentlemen.

4          MR. SITTER:  Your Honor --

09:53:21  5          THE COURT:  Yes, sir.  I'm sorry.  Go ahead,

6  Mr. Sitter.

7          MR. SITTER:  I'm sorry.  I just wanted to be clear

8  about the first two weeks of June.  If you mean the week ending

9  the 11th of June, then I have no conflict.  If you're getting

09:53:36  10 into that following week, I have a conflict towards the end of

11 the week from Wednesday through Friday.

12         THE COURT:  I don't have any -- I don't have any

13 particular preference right now; but with that in mind, I'm

14 going to set a date certain -- it would probably be a Thursday

09:53:53  15 -- for a hearing; and if you get your depositions done and get

16 it submitted, it may be that it will be done telephonically -- I

17 mean, you can -- not telephonically, but you will be reporting

18 in telephonically as opposed to in-court presentations because

19 you might not have anything else that needs to be presented to

09:54:11  20 the Court other than your arguments.

21             And I can -- I don't know that I would take

22 arguments on the -- on the depositions, but I would expect your

23 papers to have already expressed your views, and I would simply

24 take those papers and the testimony that you direct me to as a

09:54:32  25 basis for going forward on the question of whether or not the

1  receiver should be appointed in some special way or whether or

2  not -- if I have already done something preliminarily as a

3  carryover, whether or not that should be terminated, okay?

4          MR. KRAMER:  Okay.

09:54:52  5          MR. SITTER:  Yes, your Honor.

6          THE COURT:  All right, gentlemen, that's all I have.

7  I'll get with you.  I expect to see your paperwork, and I expect

8  you to -- as soon as you can agree to, hopefully, file the names

9  of the persons or titles of the persons with the Court just

09:55:07  10  simply as a notice as to the depositions that are being taken.

11          MR. KRAMER:  Okay.

12          THE COURT:  Thank you, gentlemen.  Have a good week.

13          MR. SITTER:  Thank you, your Honor.  Have a good day.

14          MR. KRAMER:  Thank you.

15      (Proceedings concluded at 9:55 a.m.)

16

17

18                    C E R T I F I C A T E

19      I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter, to
    the best of my ability.
20      This record was taken through video or telephone
    conference which may have affected the quality of the record.

21
    By: /s/*Gayle L. Dye*                    *05-04-2021*
22      Gayle L. Dye, CSR, RDR, CRR          Date

23

24

25

                Gayle Dye, CSR, RDR, CRR - 713.250.5582

## $

**$10** [1] - 24:10
**$25,000** [1] - 17:8
**$3.425** [1] - 20:13
**$30,000** [2] - 17:10, 19:21
**$500,000** [1] - 20:16
**$60,000** [2] - 16:25, 17:2

## /

**/s/Gayle** [1] - 39:21

## 0

**05-04-2021** [1] - 39:21

## 1

**11th** [1] - 38:9
**12** [1] - 18:18
**13** [1] - 18:18
**15222** [1] - 1:17
**1800** [1] - 1:16
**1st** [1] - 37:10

## 2

**20** [1] - 17:10
**201** [1] - 1:21
**2020** [2] - 11:11, 11:25
**2021** [2] - 1:7, 3:2
**21-926** [1] - 3:7
**25** [1] - 19:21
**2504** [1] - 1:21
**26** [2] - 1:7, 3:2
**260** [1] - 1:16
**2nd** [3] - 37:7, 37:19, 37:24

## 3

**3.4** [1] - 4:16
**30** [7] - 13:14, 15:16, 31:3, 31:9, 32:5, 32:11, 33:16
**30-day** [1] - 33:14

## 4

**4** [1] - 14:17
**412.667.6000** [1] - 1:17
**45** [3] - 6:2, 31:9, 33:16

## 5

**5** [1] - 14:7
**50** [1] - 17:1
**504.599.5623** [1] - 1:22
**515** [1] - 2:2

## 6

**60** [3] - 13:14, 15:16

## 7

**70170** [1] - 1:22
**713.250.5582** [1] - 2:3
**77002** [1] - 2:3

## 8

**8004** [1] - 2:2
**866.667.3890** [1] - 1:23

## 9

**9:01** [1] - 1:8
**9:55** [1] - 39:15

## A

**a.m** [2] - 1:8, 39:15
**ability** [2] - 17:25, 39:19
**able** [3] - 21:9, 24:18, 28:24
**above-entitled** [1] - 39:19
**accomodation** [1] - 5:13
**accomplish** [1] - 26:22
**accomplished** [2] - 10:6, 33:13
**accordance** [1] - 11:18
**according** [2] - 18:3, 18:5
**account** [23] - 5:9, 7:1, 7:2, 7:18, 7:20, 16:9, 16:16, 17:5, 17:21, 17:22, 18:1, 18:2, 18:6, 18:7, 18:8, 18:10, 18:13, 18:19, 18:23, 18:24, 18:25, 19:4, 21:16
**accounts** [1] - 17:17
**acquiesce** [1] - 13:2
**act** [1] - 6:17
**Action** [1] - 1:5
**add** [1] - 34:14
**additional** [1] - 36:4
**address** [4] - 10:2, 23:3, 25:13, 26:10
**addressed** [4] - 3:24, 27:3, 28:20, 29:15
**adequately** [2] - 23:21, 26:11
**admission** [1] - 25:21
**admit** [3] - 8:7, 19:15
**advance** [3] - 8:14, 14:12, 37:6
**advised** [1] - 7:10
**affected** [2] - 12:4, 39:20
**affidavit** [1] - 13:6
**ago** [2] - 24:14, 29:20
**agree** [5] - 8:14, 21:12, 22:5, 36:25, 39:8
**agreed** [1] - 6:1

**agreement** [12] - 4:21, 5:14, 11:19, 11:22, 12:14, 12:15, 17:21, 18:5, 36:9, 36:10
**agreements** [2] - 17:13, 30:1, 30:6
**ahead** [11] - 4:6, 8:16, 8:18, 9:11, 11:6, 13:3, 19:15, 22:4, 28:3, 32:9, 38:5
**AIDED** [1] - 1:25
**akramer@kramerllc.com** [1] - 1:23
**allow** [3] - 21:17, 29:21, 30:3
**alone** [1] - 25:24
**alternative** [3] - 5:22, 30:14
**alternatives** [1] - 30:10
**amenable** [1] - 37:1
**amendment** [1] - 5:13
**amount** [2] - 27:14, 27:17
**amounts** [4] - 4:18, 11:20, 11:23, 12:18
**analysis** [2] - 8:10, 26:5
**ANDREW** [1] - 1:20
**Andrew** [1] - 1:20
**andrew** [2] - 3:16, 11:8
**Ankura** [1] - 24:5
**anticipate** [6] - 27:16, 31:11, 33:18, 34:11, 34:17, 35:9
**anticipated** [1] - 4:2
**anticipates** [1] - 32:24
**anyway** [2] - 35:4, 37:17
**apologize** [1] - 23:2
**appear** [2] - 8:8, 33:8
**APPEARANCES** [1] - 1:13
**applies** [1] - 26:5
**appoint** [5] - 5:1, 7:25, 8:5, 14:16, 28:23
**appointed** [6] - 8:13, 13:25, 25:20, 27:2, 34:3, 39:1
**appointing** [1] - 20:25
**appointment** [6] - 3:25, 4:23, 8:10, 25:16, 29:2, 31:25
**appreciate** [2] - 25:12, 28:8
**appreciation** [2] - 4:7, 16:17
**approach** [1] - 25:15
**approval** [1] - 18:12
**April** [2] - 1:7, 3:2
**ARC** [33] - 1:4, 3:6, 3:8, 3:10, 5:16, 7:16, 11:21, 12:13, 12:25, 13:1, 13:3, 14:2, 14:5, 16:13, 17:14, 17:25, 18:5, 18:8, 18:11, 18:24, 19:4, 19:9, 19:14, 19:15, 19:22, 19:23, 20:18, 20:19, 22:19, 32:22, 35:10
**ARC's** [2] - 18:13, 18:14
**argument** [6] - 8:21, 25:19, 25:22, 26:4, 26:13, 35:22
**arguments** [3] - 7:22, 38:20, 38:22
**arise** [1] - 10:15

**arrangement** [1] - 5:22
**aspects** [1] - 30:13
**asset** [2] - 5:7, 10:5
**assets** [12] - 5:4, 5:11, 6:18, 9:8, 9:12, 9:16, 10:22, 20:7, 21:22, 22:20, 23:11, 23:22
**assigned** [1] - 30:4
**assignment** [1] - 30:6
**assignments** [1] - 30:2
**associated** [1] - 10:17
**assume** [2] - 23:19, 31:18
**attach** [2] - 11:14, 11:17
**attempting** [1] - 16:9
**attendance** [1] - 33:1
**August** [1] - 12:18
**authority** [3] - 18:24, 19:2, 30:4
**automatic** [5] - 13:12, 18:17, 29:2, 30:3
**automatically** [2] - 18:1, 18:13
**available** [6] - 16:25, 31:14, 31:16, 31:17, 31:19, 37:7
**Avenue** [2] - 1:16, 1:21
**awhile** [1] - 13:11

## B

**backed** [1] - 10:20
**background** [2] - 4:11, 7:21
**backup** [1] - 24:3
**badly** [1] - 23:16
**bank** [1] - 7:1
**bankruptcy** [2] - 12:2, 13:23
**barrel** [1] - 24:10
**barrels** [2] - 11:20, 13:9
**based** [7] - 13:14, 17:2, 19:10, 20:8, 20:17, 23:7, 25:24
**basic** [1] - 23:20
**basis** [4] - 4:17, 34:15, 35:15, 38:25
**becomes** [1] - 18:14
**BEFORE** [1] - 1:11
**beginning** [1] - 23:9
**begun** [2] - 13:8, 13:19
**behalf** [3] - 3:10, 3:17, 11:8
**behind** [4] - 5:12, 5:17, 19:15, 21:7
**believes** [2] - 10:1, 26:7
**belt** [2] - 25:15, 28:22
**belt-and-suspenders** [2] - 25:15, 28:22
**Ben** [1] - 3:9
**ben** [2] - 18:7, 19:6
**Benjamin** [1] - 1:15
**best** [1] - 39:19
**better** [2] - 9:20, 21:9

between [1] - 17:14
beyond [2] - 16:3, 16:10
bills [1] - 23:25
bit [1] - 17:9
blank [1] - 27:14
bolts [1] - 35:18
bond [1] - 27:1
bottom [2] - 27:7, 30:25
breach [2] - 14:12, 16:14
break [1] - 14:18
brief [1] - 28:9
bsitter@mcguirewoods.
  com [1] - 1:18
burdensome [1] - 34:17
Burton [1] - 7:13
buying [1] - 13:15
BY [1] - 1:24

**C**

canceled [1] - 30:7
candidate [1] - 27:16
candidates [1] - 27:15
cannot [1] - 23:20
careful [1] - 30:8
carryover [1] - 39:3
case - 14:3
cases [2] - 8:11, 26:1
cash [1] - 4:20
CEO [5] - 7:14, 16:8, 16:18,
  18:12, 24:3
certain [10] - 4:18, 11:19,
  11:23, 13:20, 17:3, 21:7,
  34:6, 36:25, 38:14
certainly [11] - 4:13, 15:24,
  17:22, 19:13, 21:5, 24:6,
  25:9, 27:19, 31:17, 35:5,
  37:2
certified [1] - 23:11
certify [1] - 39:18
chance [1] - 21:1
change [1] - 18:19
charge [3] - 20:14, 23:13,
  24:11
Charles [1] - 1:21
choice [1] - 28:17
circumstance [1] - 28:23
cited [2] - 8:11, 25:25
Civil [1] - 1:5
clarification [1] - 32:2
clauses [1] - 30:3
clear [5] - 7:24, 8:2, 10:6,
  32:6, 38:7
client [19] - 4:16, 4:21, 5:1,
  5:3, 5:10, 5:20, 6:5, 6:12,
  6:17, 7:2, 7:6, 7:25, 10:10,
  15:10, 21:22, 23:7, 23:10,
  24:1, 24:7
close [1] - 20:10

co [4] - 19:24, 20:1, 20:2,
  20:5
co-debtor [4] - 19:24, 20:1,
  20:2, 20:5
collecting [1] - 16:1
collection [1] - 19:16
college [1] - 37:13
comfortable [1] - 26:12
coming [5] - 7:3, 8:6, 13:22,
  14:14, 21:15
companies [4] - 12:2, 12:3,
  15:3, 25:4
company [19] - 12:19, 13:2,
  13:5, 13:17, 13:21, 13:24,
  20:8, 20:17, 21:3, 23:15,
  23:16, 23:20, 23:21, 29:19,
  30:7, 30:11, 35:6, 35:7
compared [2] - 19:22, 20:18
competent [1] - 26:11
complaint [1] - 11:14
completed [1] - 6:16
COMPUTER [1] - 1:25
COMPUTER-AIDED [1] -
  1:25
concern [7] - 7:13, 9:4,
  10:10, 14:23, 24:9, 25:6,
  36:14
concerned [10] - 9:22, 9:23,
  10:14, 10:23, 14:25, 15:1,
  16:7, 17:24, 24:18, 32:19
concerns [1] - 11:6
concluded [1] - 39:15
condition [1] - 10:12
conditions [1] - 10:16
conference [1] - 39:20
CONFERENCE [1] - 1:12
conflict [2] - 38:9, 38:10
consider [1] - 33:11
consideration [1] - 13:19
considerations [1] - 26:9
considered [1] - 30:6
consistent [1] - 7:4
contacted [1] - 7:15
contesting [1] - 25:22
contract [24] - 4:15, 5:3,
  5:11, 6:25, 7:5, 7:16, 7:23,
  7:24, 8:5, 8:8, 8:13, 10:17,
  11:9, 11:12, 14:10, 14:11,
  21:13, 21:19, 22:9, 22:12,
  24:20, 25:19, 26:6, 35:19
contractual [1] - 21:21
control [3] - 7:3, 20:18,
  30:11
controlled [2] - 5:10, 7:2
conversations [2] - 5:25,
  22:23
copious [1] - 34:17
correct [5] - 10:15, 19:5,
  19:6, 36:22, 39:18
corrected [1] - 18:21

correlated [1] - 9:13
cost [1] - 12:6
costs [2] - 16:5, 17:11
counsel [1] - 32:22
couple [5] - 8:16, 14:19,
  18:20, 26:20
course [2] - 6:12, 31:5
court [3] - 3:22, 5:5, 38:18
COURT [68] - 1:1, 2:1, 3:3,
  3:11, 3:14, 3:18, 3:21,
  4:13, 8:16, 8:19, 9:2, 9:9,
  9:11, 9:18, 10:13, 10:17,
  10:23, 11:5, 14:18, 15:18,
  15:20, 15:24, 17:18, 17:20,
  17:24, 18:11, 19:1, 19:8,
  19:12, 20:20, 22:2, 22:7,
  23:4, 24:9, 24:17, 24:24,
  26:23, 27:21, 27:25, 28:2,
  28:21, 31:1, 31:10, 31:20,
  32:8, 32:10, 32:14, 33:2,
  33:5, 33:20, 33:24, 34:1,
  34:24, 35:8, 35:14, 36:4,
  36:18, 36:20, 37:3, 37:9,
  37:12, 37:15, 37:21, 38:2,
  38:5, 38:12, 39:6, 39:12
Court [7] - 8:6, 9:22, 23:12,
  24:6, 32:24, 38:20, 39:9
courtroom [2] - 33:8, 34:6
courts [2] - 8:12, 26:1
cover [2] - 3:23, 9:25
covered [1] - 26:25
COVID [2] - 11:10, 11:24
craft [1] - 35:25
creditors [1] - 19:13
crop [1] - 37:15
CRR [2] - 2:2, 39:22
CSR [2] - 2:2, 39:22
curious [2] - 22:12, 23:4
current [4] - 6:1, 9:13, 10:12,
  10:16
customer [2] - 15:12, 15:13

**D**

damage [1] - 26:25
Date [1] - 39:22
date [8] - 4:20, 25:11, 32:2,
  34:5, 37:7, 37:24, 37:25,
  38:14
daughter's [1] - 37:8
davie [1] - 6:1
days [10] - 13:10, 13:14,
  15:17, 31:4, 31:6, 31:9,
  32:5, 32:11, 33:16
debtor [4] - 19:24, 20:1,
  20:2, 20:5
debtors [1] - 19:13
debts [1] - 19:3
decided [1] - 19:25
declarations [1] - 30:22

declare [1] - 14:12
deeply [2] - 9:16
default [9] - 4:25, 5:21, 7:24,
  7:25, 8:2, 12:24, 21:20,
  25:20, 25:21
defaulted [2] - 8:6, 8:7
Defendant [3] - 1:8, 3:15,
  3:19
DEFENDANT [1] - 1:19
define [3] - 14:22, 31:24,
  31:25
defined [1] - 35:21
defining [1] - 36:7
delivered [1] - 10:20
delivery [2] - 4:19, 4:20
demonstrates [1] - 21:24
dependent [1] - 24:21
deposed [2] - 36:8, 36:15
deposit [2] - 5:8, 7:8
deposited [2] - 7:18, 7:19
deposition [2] - 31:14, 33:14
depositions [18] - 26:21,
  30:19, 31:5, 31:8, 33:2,
  33:3, 33:6, 34:16, 35:16,
  36:7, 36:13, 36:20, 36:25,
  37:4, 38:15, 38:22, 39:10
described [1] - 28:22
desire [1] - 23:14
desires [1] - 26:15
detailed [3] - 6:6, 6:10, 27:9
determine [2] - 21:3, 27:1
determines [1] - 14:20
determining [1] - 34:9
different [6] - 7:20, 11:12,
  16:8, 16:16, 24:6, 27:16
dip [1] - 24:13
direct [2] - 5:8, 38:24
directed [1] - 7:17
direction [1] - 22:10
directly [2] - 9:13, 11:21
disaster [1] - 12:3
disastrous [1] - 30:7
discounted [1] - 9:16
discovery [9] - 26:15, 31:1,
  31:8, 32:8, 32:10, 33:17,
  34:8, 34:10, 35:15
discretion [1] - 26:2
discuss [1] - 8:19
dispute [3] - 8:8, 34:10,
  35:22
disputing [1] - 8:2
distribute [1] - 12:17
distribution [1] - 28:25
DISTRICT [2] - 1:1, 1:2
divert [1] - 16:8
diverting [1] - 16:15
DIVISION [1] - 1:3
document [2] - 33:9, 34:18
documents [8] - 25:1, 26:20,

34:15, 35:10, 35:12, 35:21, 36:1, 36:4
**dollar** [2] - 14:6, 14:17
**dollars** [4] - 16:3, 19:21, 20:11, 23:17
**done** [18] - 9:21, 11:10, 12:18, 21:10, 26:1, 27:8, 29:11, 31:3, 31:6, 31:8, 31:9, 31:18, 33:7, 33:14, 33:25, 38:15, 38:16, 39:2
**double** [3] - 13:7, 16:14, 30:24
**down** [7] - 12:9, 12:10, 12:22, 17:6, 17:7, 19:21, 26:16
**drafted** [1] - 21:13
**drastic** [2] - 5:2, 22:17
**driver** [1] - 22:24
**due** [5] - 4:20, 5:17, 12:18, 14:2, 35:23
**during** [3] - 6:11, 25:4, 25:5
**DYE** [1] - 2:2
**Dye** [2] - 39:21, 39:22

## E

**effect** [2] - 14:10, 14:12
**efforts** [1] - 34:19
**either** [1] - 33:8
**emergency** [1] - 4:8
**employee** [1] - 22:23
**employees** [1] - 11:2
**end** [3] - 17:16, 27:4, 38:10
**ending** [1] - 38:8
**enforceable** [2] - 8:14, 25:23
**enforced** [1] - 8:15
**enforcement** [1] - 8:4
**engaged** [1] - 31:23
**ensure** [3] - 7:4, 21:15, 25:16
**enter** [2] - 5:4, 21:21
**entered** [2] - 11:9, 11:11
**entitled** [4] - 22:11, 26:17, 35:12, 39:19
**entity** [2] - 20:1, 29:22
**environmental** [1] - 6:7
**escrow** [15] - 5:9, 7:2, 7:18, 18:6, 18:8, 18:9, 18:13, 18:14, 18:19, 18:23, 18:24, 18:25, 19:3, 21:16
**especially** [2] - 34:19, 36:24
**essentially** [4] - 5:3, 13:1, 13:7, 18:6
**established** [1] - 23:18
**evaluate** [1] - 6:1
**evaluation** [5] - 6:4, 9:20, 9:22, 20:9, 23:8
**evaluator** [1] - 9:19
**event** [2] - 4:25, 25:20
**eventually** [1] - 12:8
**evidence** [5] - 4:2, 10:7,

25:6, 26:11, 33:10
**exactly** [1] - 11:16
**example** [1] - 28:24
**except** [1] - 29:5
**expect** [4] - 36:4, 38:22, 39:7
**expedited** [1] - 34:15
**expenses** [1] - 23:20
**experience** [1] - 6:3
**expertise** [1] - 23:1
**expired** [1] - 29:20
**expiring** [1] - 10:24
**exposed** [1] - 10:11
**expressed** [1] - 38:23
**expressly** [1] - 4:25
**extent** [3] - 18:17, 35:2, 36:24

## F

**facetiously** [1] - 37:22
**fact** [5] - 14:4, 24:19, 26:9, 28:8, 35:11
**fact-specific** [1] - 26:9
**factored** [1] - 9:15
**facts** [1] - 28:10
**factual** [3] - 28:6, 28:14
**fairly** [1] - 26:20
**far** [3] - 10:7, 29:7, 32:19
**farmout** [2] - 30:1, 30:6
**FAX** [1] - 1:23
**February** [1] - 11:10
**fees** [1] - 20:14
**fell** [4] - 5:12, 5:17, 12:1, 12:4
**fetch** [1] - 24:19
**few** [4] - 12:14, 13:10, 15:22, 21:11
**field** [12] - 6:2, 8:24, 9:14, 9:15, 9:21, 10:12, 21:8, 22:3, 22:25, 23:5, 23:18, 23:23
**fields** [2] - 12:7, 23:5
**figure** [1] - 29:14
**file** [1] - 39:8
**filed** [5] - 6:18, 12:2, 13:4, 14:6, 17:16
**filing** [1] - 13:23
**finances** [1] - 29:1
**financial** [2] - 30:13, 34:20, 35:20
**findings** [1] - 6:5
**fine** [1] - 24:7
**firm** [1] - 9:22
**first** [17] - 7:23, 12:24, 18:22, 19:24, 21:12, 21:14, 21:15, 21:20, 22:1, 24:25, 25:18, 28:5, 32:15, 34:6, 37:13, 37:23, 38:8
**five** [1] - 4:18
**five-year** [1] - 4:18

**flip** [2] - 18:13, 33:9
**floor** [2] - 12:1, 12:5
**flow** [2] - 18:2
**focus** [1] - 10:4
**fold** [1] - 12:15
**following** [1] - 38:10
**follows** [1] - 29:2
**FOR** [2] - 1:14, 1:19
**Forbes** [1] - 1:16
**foregoing** [1] - 39:18
**form** [1] - 4:19
**former** [1] - 7:14
**forward** [5] - 4:12, 12:16, 29:24, 36:7, 38:25
**four** [1] - 31:5
**Friday** [4] - 14:6, 16:22, 28:7, 38:11
**FROM** [1] - 1:25
**front** [2] - 16:10, 16:13
**fuel** [1] - 15:5
**full** [2] - 30:17, 34:5
**fully** [3] - 19:9, 20:2, 20:19
**funding** [1] - 5:23
**funds** [9] - 7:18, 16:8, 18:2, 18:8, 18:11, 18:12, 18:13, 18:18, 18:25

## G

**gas** [4] - 6:3, 12:1, 12:2, 15:4
**gather** [2] - 9:21, 19:4
**GAYLE** [1] - 2:2
**Gayle** [1] - 39:22
**general** [1] - 26:5
**generally** [2] - 10:5, 32:22
**generated** [1] - 16:6
**gentlemen** [3] - 38:3, 39:6, 39:12
**Geocertified** [2] - 24:5, 29:19
**graduation** [1] - 37:8
**grant** [1] - 25:7
**granting** [1] - 25:9
**great** [1] - 28:12
**ground** [6] - 9:23, 9:25, 10:1, 19:10, 20:20, 24:15
**guarantor** [1] - 20:2
**guess** [3] - 21:7, 24:11, 31:12
**GUIRE** [1] - 1:15
**guys** [1] - 37:16

## H

**H-21-CV-926** [1] - 1:6
**half** [1] - 35:16
**half-day** [1] - 35:16
**hand** [2] - 25:15
**hand-in-hand** [1] - 25:15
**handle** [3] - 22:25, 23:1, 30:12

**handles** [1] - 7:8
**happy** [4] - 4:10, 8:12, 34:22, 35:11
**health** [1] - 6:7
**heard** [3] - 6:22, 9:3, 33:21
**hearing** [16] - 4:3, 25:10, 25:11, 25:25, 26:2, 28:15, 28:17, 28:18, 29:9, 30:16, 31:22, 32:11, 32:14, 32:25, 33:15, 38:15
**hearsay** [2] - 13:7, 30:24
**HELD** [1] - 1:10
**held** [1] - 8:12
**helpful** [1] - 4:12
**hide** [1] - 34:23
**high** [2] - 37:8, 37:13
**higher** [1] - 20:14
**highway** [1] - 15:6
**himself** [1] - 22:25
**hit** [1] - 11:23
**hits** [2] - 18:24, 19:3
**Honor** [44] - 3:9, 3:13, 3:16, 3:20, 4:10, 4:14, 7:22, 8:18, 9:1, 9:7, 10:19, 11:1, 11:4, 11:7, 14:17, 19:7, 21:11, 22:16, 23:2, 24:13, 25:13, 25:24, 26:2, 26:7, 26:15, 27:8, 27:15, 27:20, 27:24, 28:1, 32:6, 32:12, 32:21, 33:19, 33:23, 34:13, 36:23, 37:6, 38:4, 39:5, 39:13
**HONORABLE** [1] - 1:11
**hopefully** [1] - 39:8
**hour** [1] - 35:16
**HOUSTON** [1] - 1:3
**Houston** [4] - 1:7, 2:3, 32:16, 34:6
**Hoyt** [1] - 3:3
**HOYT** [1] - 1:11
**hundred** [4] - 13:9, 19:20, 20:10, 23:17

## I

**identified** [3] - 14:4, 29:18, 34:20
**identify** [1] - 14:6
**identity** [1] - 27:13
**immediately** [1] - 16:22
**in-court** [1] - 38:18
**INC** [1] - 1:7
**include** [1] - 6:7
**increase** [2] - 5:7, 6:14
**increased** [1] - 13:9
**indicate** [1] - 29:4
**indicated** [1] - 19:9
**indicating** [1] - 33:10
**individual** [1] - 29:22
**inflated** [1] - 6:23

**initial** [1] - 25:13
**injunction** [13] - 3:25, 4:3, 14:24, 25:9, 25:14, 28:15, 29:4, 29:8, 29:10, 29:13, 30:18
**injunctive** [1] - 31:25
**input** [1] - 24:7
**insensitive** [1] - 24:21
**instance** [1] - 21:17
**instead** [1] - 7:18
**intend** [1] - 37:17
**intention** [1] - 13:23
**interest** [5] - 4:23, 5:10, 16:2, 16:18, 20:13
**interested** [1] - 16:1
**interests** [1] - 10:21
**interfere** [2] - 29:5, 31:11
**interfered** [1] - 29:3
**interfering** [1] - 25:17
**intrusive** [1] - 30:14
**inviting** [1] - 36:5
**issue** [12] - 4:14, 7:24, 8:4, 14:3, 14:19, 15:14, 20:6, 20:7, 24:15, 35:24, 36:17
**issues** [14] - 3:23, 6:9, 13:18, 26:12, 28:6, 28:12, 28:14, 28:19, 29:15, 30:8, 30:21, 30:25, 34:20
**itself** [6] - 4:19, 9:6, 10:18, 14:20, 24:23, 29:4

## J

**jeopardy** [2] - 10:2, 10:25
**joint** [2] - 18:5, 18:7
**July** [1] - 15:3
**jump** [1] - 32:16
**June** [10] - 32:15, 34:6, 37:7, 37:10, 37:13, 37:19, 37:24, 38:8, 38:9

## K

**Kansas** [8] - 8:25, 9:1, 9:2, 29:18, 29:21, 29:25, 36:12
**keep** [3] - 14:10, 14:13, 28:9
**Ken** [1] - 3:3
**KENNETH** [1] - 1:11
**kind** [14] - 4:3, 7:21, 8:15, 11:25, 12:11, 12:15, 16:14, 19:18, 23:1, 28:23, 30:8, 30:12, 30:13, 37:21
**kinds** [1] - 23:22
**KLMKH** [27] - 1:7, 3:6, 3:17, 4:16, 4:17, 5:12, 5:17, 5:23, 6:13, 6:21, 7:12, 7:14, 7:16, 8:2, 10:11, 10:22, 11:3, 11:8, 12:4, 12:13, 12:14, 14:4, 17:14, 19:18, 20:3, 35:22, 37:1

**KLMKH's** [1] - 5:10
**knows** [1] - 22:10
**Kramer** [10] - 1:20, 3:16, 3:19, 11:5, 11:8, 26:24, 27:23, 33:22, 34:24, 36:2
**KRAMER** [36] - 1:20, 3:16, 3:20, 9:1, 11:7, 15:13, 15:19, 15:21, 16:20, 17:19, 17:23, 18:4, 18:16, 19:5, 19:11, 19:17, 27:24, 28:1, 28:4, 29:7, 31:3, 31:16, 33:23, 33:25, 34:22, 35:5, 35:9, 36:3, 37:2, 37:4, 37:11, 37:18, 38:1, 39:4, 39:11, 39:14

## L

**labor** [2] - 22:3, 22:8
**laborers** [1] - 22:11
**lack** [1] - 9:20
**laid** [1] - 16:4
**land** [3] - 10:18, 10:22
**lapsed** [1] - 11:4
**last** [8] - 5:12, 5:20, 13:10, 14:5, 14:22, 18:18, 18:19, 18:20
**lawsuit** [2] - 6:19, 13:4
**lawyers** [2] - 36:9, 36:10
**lease** [1] - 10:22
**leases** [6] - 10:21, 10:24, 11:3, 13:17, 17:3, 30:2
**least** [8] - 19:8, 31:21, 32:23, 34:4, 35:3, 35:7, 35:20, 35:21
**left** [2] - 17:9, 27:14
**length** [1] - 31:2
**less** [1] - 30:14
**lessors** [1] - 21:7
**level** [1] - 23:10
**Lewis** [1] - 1:20
**liabilities** [2] - 10:11, 10:13
**liability** [1] - 27:11
**license** [1] - 29:20
**licensed** [5] - 29:17, 29:18, 29:20, 29:22, 29:24
**licenses** [1] - 7:15
**liens** [7] - 13:22, 17:1, 17:2, 17:4, 17:5, 18:22, 19:18
**light** [1] - 14:23
**likely** [1] - 10:15
**limitations** [1] - 27:11
**limited** [3] - 26:20, 34:2, 35:15
**line** [7] - 3:8, 3:14, 3:18, 19:14, 21:13, 21:15, 21:20
**live** [1] - 33:6
**LLC** [2] - 1:4, 1:20
**LLP** [1] - 1:15
**loan** [7] - 11:10, 11:12,

11:13, 11:21, 20:3, 20:13, 20:16
**located** [1] - 8:24
**long-term** [1] - 15:25
**look** [4] - 15:1, 25:1, 25:10, 34:2
**looked** [1] - 27:5
**looking** [2] - 14:15, 34:11
**Louisiana** [1] - 1:22
**low** [1] - 12:9
**lower** [1] - 7:11
**LPW** [2] - 1:4, 3:6

## M

**Maclaskey** [3] - 7:10, 7:17
**major** [3] - 14:3, 19:20, 19:22
**makeup** [1] - 5:18
**man** [1] - 7:14
**manage** [2] - 28:24, 32:4
**managed** [2] - 23:16, 23:21
**management** [2] - 23:1, 29:1
**March** [8] - 6:4, 6:17, 7:16, 11:25, 13:3, 13:6, 15:21, 15:22
**market** [10] - 9:4, 9:5, 9:13, 9:17, 11:25, 15:9, 15:11, 20:23, 24:10, 24:16
**marketable** [1] - 20:21
**marketer** [5] - 7:7, 7:15, 18:4, 18:9, 18:12
**married** [2] - 37:16, 37:18
**matter** [11] - 3:4, 21:2, 22:9, 22:21, 23:9, 24:11, 25:13, 28:6, 33:16, 34:5, 39:19
**matters** [1] - 36:24
**MC** [1] - 1:15
**McGuire** [1] - 1:15
**mean** [51] - 8:20, 12:3, 12:19, 13:18, 13:24, 14:1, 14:16, 15:16, 16:12, 16:20, 17:1, 17:7, 17:15, 17:17, 18:4, 18:19, 19:12, 20:2, 20:4, 20:5, 20:8, 20:10, 20:17, 20:19, 21:3, 22:7, 28:5, 28:16, 28:19, 29:7, 29:8, 29:9, 29:11, 29:14, 29:15, 29:17, 29:23, 30:8, 30:10, 30:12, 30:14, 30:16, 31:4, 31:7, 36:5, 36:9, 38:8, 38:17
**MEANS** [1] - 1:24
**measure** [1] - 34:5
**meet** [2] - 10:1, 23:20
**memo** [4] - 16:21, 28:7, 28:9
**mid** [2] - 6:17, 7:16
**mid-March** [2] - 6:17, 7:16
**might** [8] - 4:2, 4:8, 15:25, 19:3, 33:12, 35:1, 35:19, 38:19

**million** [6] - 4:16, 14:7, 14:17, 20:11, 20:13, 23:17
**mind** [1] - 38:13
**minimal** [1] - 23:22
**minimums** [2] - 11:22, 11:24
**minor** [1] - 19:17
**minute** [1] - 4:1
**Minyard** [7] - 6:1, 6:16, 11:1, 13:18, 22:22, 30:20, 31:18
**Minyard's** [1] - 10:10
**miss** [1] - 35:23
**missed** [3] - 12:14, 12:15, 23:23
**misunderstood** [1] - 17:15
**Monday** [1] - 36:1
**money** [13] - 7:3, 7:4, 16:2, 16:15, 17:4, 17:17, 17:20, 17:21, 18:4, 18:5, 22:14, 35:23
**month** [1] - 26:22
**monthly** [3] - 4:17, 14:9, 14:14
**months** [5] - 5:21, 18:18, 29:20
**morning** [1] - 3:3
**most** [2] - 23:20, 31:13
**motion** [11] - 3:24, 4:2, 4:24, 6:19, 8:20, 8:21, 11:14, 14:23, 26:3
**move** [1] - 4:12
**moving** [3] - 15:4, 15:5, 36:7
**MR** [70] - 3:9, 3:13, 3:16, 3:20, 4:10, 4:14, 8:18, 8:25, 9:1, 9:7, 9:10, 9:12, 10:4, 10:15, 10:19, 11:1, 11:7, 15:13, 15:19, 15:21, 16:20, 17:19, 17:23, 18:4, 18:16, 19:5, 19:7, 19:11, 19:17, 21:11, 22:5, 22:16, 23:9, 24:13, 24:18, 25:12, 27:8, 27:24, 28:1, 28:4, 29:7, 31:3, 31:16, 32:6, 32:12, 32:21, 33:4, 33:18, 33:23, 33:25, 34:13, 34:22, 35:5, 35:9, 36:3, 36:16, 36:19, 36:23, 37:2, 37:4, 37:11, 37:18, 38:1, 38:4, 38:7, 39:4, 39:5, 39:11, 39:13, 39:14
**MS** [1] - 32:9
**mutual** [2] - 26:16, 26:18

## N

**names** [2] - 36:8, 39:8
**nature** [2] - 7:23, 31:25
**necessarily** [2] - 8:19, 16:2
**necessary** [9] - 25:10, 26:3, 26:8, 26:18, 28:3, 29:13, 30:17, 32:17, 34:9

**need** [22] - 3:24, 4:4, 6:11, 6:17, 4:25, 25:1, 25:7, 25:10, 26:19, 26:25, 27:6, 28:20, 29:15, 30:8, 30:19, 30:24, 31:22, 35:1, 36:8, 36:15
**needed** [4] - 12:20, 12:21, 25:18, 25:19
**needing** [1] - 35:10
**needs** [4] - 31:8, 31:23, 33:7, 38:19
**negotiate** [1] - 12:25
**negotiated** [1] - 4:22
**neutral** [2] - 5:6, 23:12
**never** [3] - 6:15, 14:4, 17:13
**New** [1] - 1:22
**new** [4] - 5:18, 12:16, 28:12, 29:25
**nobody** [1] - 20:21
**non** [1] - 29:22
**non-licensed** [1] - 29:22
**none** [1] - 33:7
**note** [8] - 6:11, 9:25, 10:1, 10:14, 11:13, 14:20, 16:1, 18:3
**nothing** [5] - 19:19, 19:22, 24:22, 25:19, 37:25
**notice** [3] - 5:5, 5:21, 39:10
**November** [7] - 5:20, 12:8, 12:10, 12:11, 12:22, 12:23, 12:24
**number** [5] - 3:6, 4:22, 6:5, 6:9, 35:19
**numbers** [3] - 6:23, 7:11, 14:22
**nuts** [1] - 35:18

**O**

**obligated** [1] - 20:2
**obligation** [3] - 5:24, 16:13, 35:20
**obligations** [2] - 17:16, 23:22, 27:11
**obtrusive** [1] - 30:14
**obviously** [7] - 10:10, 11:11, 11:24, 12:20, 12:22, 16:21, 28:5
**occur** [2] - 22:13, 23:15
**occurred** [1] - 6:20
**occurring** [1] - 22:6
**OF** [2] - 1:2, 1:10
**oil** [26] - 4:17, 4:19, 4:20, 5:9, 6:2, 6:3, 6:8, 7:7, 7:8, 7:15, 11:20, 12:1, 12:2, 13:12, 13:13, 15:15, 20:20, 20:23, 21:1, 24:10, 24:14, 24:15, 24:19, 24:21, 24:23
**once** [3] - 18:23, 19:3, 29:25
**one** [17] - 4:23, 6:20, 7:7,

7:23, 14:5, 15:8, 17:15, 19:8, 20:6, 22:17, 22:23, 29:19, 30:23, 32:23, 35:3, 35:6, 35:7
**ones** [2] - 6:24, 26:6
**ongoing** [1] - 12:11
**onsite** [1] - 11:2
**open** [3] - 13:8, 15:11, 37:8
**opening** [1] - 6:6
**operate** [4] - 12:6, 23:11, 25:17, 30:2
**operation** [6] - 6:2, 17:11, 23:5, 25:3, 30:11
**operations** [3] - 5:7, 6:3, 23:13
**operator** [5] - 17:12, 19:17, 19:22, 29:25, 30:5
**operator's** [1] - 7:14
**operators** [1] - 29:17
**opinion** [1] - 24:3
**opportunity** [5] - 25:12, 28:8, 28:11, 30:18, 34:14
**opposed** [1] - 38:18
**opposition** [2] - 6:21, 7:6
**order** [7] - 5:5, 21:5, 25:7, 27:6, 27:9, 29:12, 35:25
**original** [1] - 11:14
**originally** [1] - 11:9
**Orleans** [1] - 1:22
**otherwise** [1] - 37:13
**ought** [2] - 34:3, 36:13
**outstanding** [2] - 20:18, 35:21
**owed** [8] - 12:17, 14:4, 14:13, 14:17, 19:3, 19:13, 19:22, 24:21
**owing** [1] - 35:23

**P**

**page** [1] - 37:23
**paid** [19] - 11:18, 11:21, 15:17, 17:2, 17:6, 18:22, 18:23, 20:16, 21:8, 21:25, 22:9, 22:17, 22:20, 23:25, 24:1, 27:14
**pandemic** [1] - 25:5
**papers** [6] - 6:6, 6:10, 7:12, 8:1, 8:11, 11:17, 15:1, 19:9, 25:8, 25:25, 26:10, 26:13, 27:3, 33:15, 34:2, 38:23, 38:24
**paperwork** [3] - 8:20, 33:11, 39:7
**part** [6] - 4:21, 5:25, 6:24, 23:14, 31:21, 33:12
**participate** [1] - 32:24
**particular** [3] - 15:12, 15:13, 38:13
**parties** [9] - 5:13, 5:21, 5:25,

8:14, 26:21, 36:9, 36:10, 36:15
**parties'** [4] - 4:11, 4:21, 6:12, 7:23
**party** [3] - 5:6, 23:12
**past** [4] - 5:16, 12:18, 14:1, 15:10
**path** [1] - 26:16
**pay** [7] - 5:23, 11:24, 12:6, 16:9, 17:10, 22:13, 22:14
**paying** [1] - 16:15
**payment** [4] - 5:9, 6:14, 13:13, 21:8
**payments** [18] - 5:12, 5:16, 5:18, 7:1, 12:14, 12:16, 12:23, 13:11, 13:14, 14:10, 14:13, 14:14, 14:20, 16:25, 17:8, 21:15
**payout** [1] - 15:25
**payroll** [1] - 23:23
**pecking** [1] - 21:5
**pending** [1] - 32:1
**Pennsylvania** [1] - 1:17
**people** [11] - 15:5, 16:9, 19:13, 19:15, 21:7, 21:8, 22:3, 22:13, 24:4, 31:14, 31:16
**perhaps** [1] - 33:8
**period** [2] - 4:18, 33:15
**person** [2] - 27:2, 33:1
**personally** [1] - 23:10
**persons** [4] - 36:8, 39:9
**perspective** [2] - 22:8, 33:14
**phone** [1] - 16:23
**picks** [1] - 7:8
**Pittsburgh** [1] - 1:17
**place** [1] - 21:6
**Plaintiff** [4] - 1:5, 3:12, 4:1, 35:1
**PLAINTIFF** [1] - 1:14
**Plaintiff's** [1] - 3:24
**plan** [3] - 6:13, 6:14, 6:22
**plane** [1] - 32:16
**planning** [1] - 37:18
**pleadings** [1] - 14:5
**plus** [1] - 16:2
**point** [12] - 5:17, 8:12, 12:11, 17:8, 19:22, 19:23, 20:5, 20:22, 28:18, 28:21, 32:2, 36:22
**position** [3] - 13:1, 19:14, 21:3
**possibility** [2] - 26:24, 27:15
**potential** [1] - 34:15
**practical** [1] - 22:21
**preference** [3] - 22:12, 24:6, 38:13
**preliminarily** [4] - 27:5, 32:1, 34:4, 39:2
**preliminary** [6] - 3:25, 4:3,

14:24, 25:9, 25:14, 29:10
**premises** [1] - 5:4, 21:21
**prepared** [1] - 32:11
**presentations** [1] - 38:18
**presented** [1] - 38:19
**presenting** [1] - 35:3
**preserve** [2] - 5:7, 6:18
**preset** [1] - 4:18
**pretty** [2] - 27:9, 31:14
**previous** [1] - 35:21
**previously** [1] - 28:13
**price** [5] - 24:10, 24:19, 24:20, 24:21, 27:18
**prices** [4] - 12:4, 12:21, 24:14
**problem** [12] - 10:23, 15:6, 29:25, 31:20, 32:18, 32:19, 32:21, 32:23, 33:18, 34:25, 37:3, 37:5
**problems** [2] - 12:20, 13:17
**proceeding** [1] - 30:15
**Proceedings** [1] - 39:15
**proceedings** [2] - 3:22, 39:19
**PROCEEDINGS** [3] - 1:10, 1:24, 3:1
**proceeds** [1] - 7:9
**process** [3] - 12:10, 15:16, 32:3
**produce** [3] - 4:17, 13:12, 13:13
**produced** [2] - 36:10, 36:11
**PRODUCED** [1] - 1:25
**producing** [2] - 12:12, 15:15
**product** [2] - 9:5, 28:25
**production** [31] - 4:15, 5:7, 5:9, 5:14, 6:8, 6:14, 6:23, 7:1, 7:11, 9:6, 9:13, 9:18, 9:19, 9:21, 10:5, 10:18, 10:20, 11:18, 11:23, 12:9, 13:8, 13:9, 15:2, 15:22, 16:6, 16:25, 18:18, 21:1, 24:20, 32:2
**productive** [1] - 23:6
**profit** [1] - 16:3
**profitable** [2] - 14:11, 14:13
**promise** [1] - 4:17
**promissory** [1] - 11:13
**promptly** [1] - 36:7
**property** [1] - 22:19
**proposed** [2] - 27:9, 27:14
**proposing** [1] - 25:2
**protect** [1] - 4:22
**protections** [2] - 4:22, 5:8
**provide** [2] - 27:19, 34:22
**provided** [5] - 4:25, 5:2, 21:14, 22:18, 33:16
**provides** [2] - 4:15, 5:3
**provision** [1] - 26:6

provisions [4] - 8:4, 8:7, 8:15, 25:22
purchasing [1] - 15:15
purposes [2] - 9:16, 21:16
pursue [1] - 19:25
pursued [1] - 20:4
put [2] - 16:12, 23:5
puts [1] - 19:14

## Q

qualified [1] - 23:12
quality [1] - 39:20
questions [3] - 8:16, 14:19, 15:8
quickly [2] - 5:17, 6:18
quote [1] - 7:17
quoting [1] - 27:17

## R

raise [1] - 28:12
raised [3] - 7:22, 28:7, 28:13
range [1] - 17:10
rate [1] - 27:2
rather [1] - 14:12
RDR [2] - 2:2, 39:22
reached [1] - 7:7
read [4] - 6:24, 16:22, 24:25, 27:4
reading [2] - 7:6, 8:1
real [2] - 13:21, 20:21
reality [1] - 22:7
really [8] - 8:3, 8:10, 12:5, 12:16, 15:5, 28:8, 35:10, 36:11
reason [5] - 13:24, 19:25, 20:3, 22:17, 31:13
reasonable [1] - 27:1
receive [1] - 18:11
receiver [32] - 3:25, 4:23, 5:1, 7:25, 8:5, 8:11, 8:13, 13:25, 14:16, 14:24, 20:22, 21:1, 24:5, 25:16, 25:20, 26:25, 27:2, 27:10, 27:13, 28:2, 28:19, 28:23, 28:24, 29:3, 29:5, 30:5, 30:11, 30:17, 31:23, 35:17, 39:1
receivers [2] - 27:17, 30:12
receivership [3] - 26:5, 29:12, 34:3
receives [1] - 18:8
receiving [2] - 16:15, 16:16
recent [1] - 17:8
recognize [3] - 21:6, 22:2, 37:24
recognized [1] - 27:15
recommended [1] - 24:5
record [4] - 4:7, 39:19, 39:20, 39:20

RECORDED [1] - 1:24
recorded [1] - 3:22
recordkeeping [1] - 10:7
records [1] - 34:20
recovery [1] - 25:3
reduction [1] - 12:17
regard [1] - 19:2
regarding [4] - 6:22, 34:10, 34:19, 35:12
relationship [2] - 4:11, 6:12
relevant [1] - 7:21
relied [2] - 15:9, 15:10
relief [2] - 4:24, 32:1
remedial [1] - 34:19
remedies [1] - 5:2
remedy [1] - 22:17
REMOTELY [2] - 1:10, 1:24
remotely [3] - 32:25, 36:25, 37:5
remove [1] - 18:24
rendering [1] - 26:8
renegotiated [1] - 14:21
reopened [1] - 13:5, 15:22
repairs [1] - 13:20
repay [1] - 11:21
reply [5] - 16:21, 28:7, 28:9, 36:2, 36:6
report [3] - 6:16, 30:21, 30:22
REPORTER [2] - 2:1, 9:9
reporter [1] - 3:23
reporting [2] - 27:11, 38:17
reports [1] - 23:12
representations [1] - 6:22
representative [1] - 35:6
representatives [1] - 35:7
represented [1] - 7:12
represents [1] - 16:3
request [5] - 25:7, 28:16, 28:18, 30:18, 34:14
requests [2] - 34:18
require [2] - 4:3, 32:25
required [3] - 8:10, 24:23, 29:9
requires [1] - 28:15
reserves [3] - 9:14, 10:8, 23:17
reset [1] - 5:14
respond [6] - 11:6, 27:22, 28:9, 28:10, 36:2, 36:6
response [1] - 37:14
responses [1] - 21:11
responsibilities [1] - 27:10
rest [1] - 22:24
return [1] - 4:16
Reuben [1] - 7:13
revelations [1] - 6:8
rights [1] - 27:10
risks [1] - 6:7

role [1] - 3:4
Room [1] - 2:2
rule [1] - 25:25
ruling [3] - 26:3, 26:8, 26:12
run [1] - 21:1
Rusk [1] - 2:2

## S

safeguards [1] - 4:22
safety [2] - 6:7, 34:20
sale [2] - 9:17, 28:25
sales [1] - 7:9
satisfied [5] - 7:17, 17:13, 17:14, 19:19
satisfy [1] - 23:22
saw [2] - 6:17, 13:18
say-so [1] - 19:4
schedule [3] - 5:14, 5:15, 5:18
schedules [2] - 13:15
school [2] - 37:8, 37:13
scope [1] - 31:22
second [2] - 21:6, 21:12
secondary [1] - 26:4
secured [5] - 19:9, 19:12, 19:23, 20:5, 20:19
security [2] - 5:10, 10:20
see [12] - 5:22, 14:3, 14:16, 24:13, 31:4, 31:10, 34:2, 34:8, 34:25, 35:10, 35:25, 39:7
seeing [1] - 24:3
seeking [8] - 4:24, 8:4, 21:18, 21:22, 21:23, 22:18, 23:10, 23:11
seem [1] - 29:4
sell [1] - 24:19
selling [3] - 5:4, 21:21, 22:20
sells [1] - 7:8
sends [2] - 18:4, 18:5
sense [2] - 4:4, 27:6
sent [1] - 5:20
separate [1] - 16:8
services [1] - 27:18
set [6] - 5:15, 27:17, 31:22, 37:9, 37:25, 38:14
several [2] - 5:21, 8:11
shipping [1] - 13:15
shortly [2] - 11:10, 19:19
shows [2] - 21:19, 33:10
shut [3] - 12:9, 12:10, 12:22
side [3] - 31:17, 34:12, 34:25
sideways [1] - 22:9
significant [2] - 10:11, 13:22
simply [6] - 15:2, 18:2, 25:3, 26:13, 29:2, 33:9, 38:23, 39:10
single [1] - 12:11

SITTER [36] - 3:9, 3:13, 4:10, 4:14, 8:18, 8:25, 9:7, 9:10, 9:12, 10:4, 10:15, 10:19, 11:1, 19:7, 21:11, 22:5, 22:16, 23:9, 24:13, 24:18, 25:12, 27:8, 32:6, 32:9, 32:12, 32:21, 33:4, 33:18, 34:13, 36:16, 36:19, 36:23, 38:4, 38:7, 39:5, 39:13
Sitter [14] - 1:15, 3:9, 4:9, 9:9, 20:24, 20:25, 28:22, 31:4, 31:20, 32:20, 34:12, 36:6, 36:21, 38:6
sitter [1] - 3:11
situation [1] - 21:25
six [1] - 29:20
Sixty [1] - 1:16
sold [1] - 11:20
solution [1] - 31:22
sometime [1] - 32:15
sometimes [1] - 37:15
somewhere [1] - 7:19
soon [1] - 39:8
sorry [7] - 8:17, 8:18, 11:4, 32:9, 36:19, 38:5, 38:7
sort [5] - 9:7, 10:24, 18:3, 24:2, 25:14
sorts [1] - 4:8
source [1] - 23:14
sources [1] - 5:23
SOUTHERN [1] - 1:2
speaking [3] - 16:19, 34:24, 36:21
special [1] - 39:1
specific [2] - 26:9, 28:10
spent [1] - 5:21
St [1] - 1:21
stand [1] - 19:15
start [2] - 5:4, 21:15
started [6] - 11:25, 12:25, 13:6, 15:21, 19:20, 20:12
starting [3] - 13:8, 13:16, 14:1
starts [2] - 22:19
state [4] - 4:6, 9:2, 29:18, 29:21
statement [1] - 4:1
states [1] - 21:19
STATES [1] - 1:1
status [1] - 6:1
STENOGRAPHIC [1] - 1:24
still [9] - 9:9, 12:19, 12:22, 14:6, 14:15, 15:10, 17:17, 18:22, 25:5
stipulate [2] - 35:19, 35:20
stop [1] - 7:17
strangely [1] - 11:15
streamline [1] - 36:24
strong [2] - 24:14, 25:8

**structured** [1] - 6:25
**submitted** [7] - 13:6, 27:9, 28:7, 30:23, 33:3, 33:15, 38:16
**subsequently** [1] - 6:20
**substantial** [1] - 9:14
**sue** [1] - 19:25
**sued** [1] - 19:24
**suffered** [2] - 25:4, 25:5
**suffering** [1] - 25:5
**suggesting** [1] - 16:10
**suit** [1] - 17:16
**Suite** [2] - 1:16, 1:21
**summer** [3] - 5:12, 12:13, 15:5
**supported** [1] - 26:11
**supposed** [6] - 5:19, 6:9, 7:1, 18:16, 21:25, 22:1
**surprised** [1] - 7:7
**surprising** [1] - 6:24
**suspect** [3] - 15:3, 15:6, 36:12
**suspenders** [2] - 25:15, 28:22

### T

**tap** [1] - 18:1
**targeted** [1] - 34:18
**technically** [1] - 18:6
**telephone** [1] - 39:20
**TELEPHONE** [1] - 1:12
**telephonically** [3] - 38:16, 38:17, 38:18
**temporarily** [1] - 34:4
**temporary** [1] - 32:1
**term** [3] - 9:20, 15:25
**terminated** [1] - 39:3
**termination** [1] - 30:4
**terms** [13] - 7:22, 8:20, 8:21, 10:19, 10:20, 16:13, 19:16, 21:7, 24:20, 25:18, 26:19, 33:6
**testimony** [4] - 4:4, 26:11, 34:9, 38:24
**TEXAS** [1] - 1:2
**Texas** [2] - 1:7, 2:3
**THE** [69] - 1:11, 1:14, 1:19, 3:3, 3:11, 3:14, 3:18, 3:21, 4:13, 8:16, 8:19, 9:2, 9:9, 9:11, 9:18, 10:13, 10:17, 10:23, 11:5, 14:18, 15:18, 15:20, 15:24, 17:18, 17:20, 17:24, 18:11, 19:1, 19:8, 19:12, 20:20, 22:2, 22:7, 23:4, 24:9, 24:17, 24:24, 26:23, 27:21, 27:25, 28:2, 28:21, 31:1, 31:10, 31:20, 32:8, 32:10, 32:14, 33:2, 33:5, 33:20, 33:24, 34:1,

34:24, 35:8, 35:14, 36:4, 36:18, 36:20, 37:3, 37:9, 37:12, 37:15, 37:21, 38:2, 38:5, 38:12, 39:6, 39:12
**themself** [1] - 33:3
**themselves** [1] - 10:21
**they've** [4] - 13:6, 14:4, 15:14, 29:18
**thinking** [2] - 31:21, 33:12
**third** [6] - 5:6, 21:6, 21:13, 23:12, 27:16
**thousand** [1] - 19:21
**three** [7] - 20:12, 31:5, 31:6, 31:12, 34:11, 35:2, 35:16
**three-hour** [1] - 35:16
**threshold** [1] - 25:3
**throwing** [1] - 37:21
**Thursday** [1] - 38:14
**titles** [2] - 36:8, 39:9
**today** [1] - 14:5
**today's** [2] - 9:12, 9:17
**top** [1] - 17:4
**total** [1] - 20:11
**towards** [1] - 38:10
**Tower** [1] - 1:16
**track** [2] - 13:25, 14:1
**transcribed** [1] - 36:20
**transcript** [1] - 39:18
**TRANSCRIPT** [2] - 1:10, 1:25
**TRANSCRIPTION** [1] - 1:25
**tremendously** [1] - 25:4
**tried** [1] - 27:5
**triple** [2] - 13:7, 30:24
**troubling** [1] - 6:5
**truck** [1] - 22:24
**true** [1] - 23:17
**try** [1] - 3:4
**trying** [10] - 5:5, 5:6, 5:21, 12:25, 13:1, 16:12, 19:1, 22:25, 24:12, 34:23
**turn** [2] - 5:23, 35:11
**Two** [1] - 1:16
**two** [14] - 4:1, 27:15, 29:17, 31:6, 31:12, 34:11, 35:2, 35:3, 35:6, 35:16, 37:13, 37:24, 38:8
**two-minute** [1] - 4:1
**Two-Sixty** [1] - 1:16
**typical** [1] - 26:4

### U

**ultimately** [3] - 5:24, 13:3, 14:19
**unclear** [2] - 14:7, 14:15
**under** [6] - 5:18, 10:15, 14:13, 17:7, 19:20, 30:2
**understood** [1] - 6:9
**UNITED** [1] - 1:1
**unless** [3] - 16:9, 28:16,

29:24
**unquote** [1] - 7:17
**unsuccessful** [1] - 5:24
**up** [10] - 3:4, 5:16, 5:19, 7:8, 12:11, 13:8, 13:9, 15:3, 34:5, 37:15
**urgent** [1] - 6:17
**utility** [1] - 23:25

### V

**value** [6] - 4:20, 6:18, 9:25, 10:5, 20:21, 24:4
**valued** [2] - 9:8, 9:12
**valuing** [1] - 9:16
**vendor** [1] - 19:18
**vendors** [2] - 23:24
**versus** [1] - 3:6
**video** [1] - 39:20
**view** [3] - 6:23, 7:22, 8:3
**views** [1] - 38:23
**virtually** [1] - 32:25
**virtue** [1] - 10:12
**visibility** [2] - 7:3, 10:6
**volumetric** [2] - 4:15, 11:18
**VPP** [1] - 11:19
**VS** [1] - 1:6

### W

**wants** [1] - 11:6
**water** [1] - 22:24
**weddings** [1] - 37:16
**Wednesday** [1] - 38:11
**week** [5] - 36:1, 38:8, 38:10, 38:11, 39:12
**weeks** [6] - 15:23, 18:20, 37:13, 37:24, 38:8
**wells** [9] - 9:1, 12:10, 12:21, 13:5, 13:8, 13:20, 17:3, 20:9, 35:12
**whole** [2] - 15:16, 22:25
**withdraw** [1] - 28:16
**withdrawn** [1] - 29:13
**witnesses** [8] - 31:11, 31:13, 32:23, 32:24, 33:6, 34:11, 35:2, 35:3
**Woods** [1] - 3:10
**WOODS** [1] - 1:15
**words** [3] - 9:24, 10:13, 15:11
**works** [1] - 25:15
**world** [1] - 11:12
**worth** [2] - 17:2, 20:10
**wreck** [1] - 25:3
**written** [1] - 31:7

### Y

**year** [4] - 4:18, 5:20, 14:22,

24:14
**years** [1] - 6:3
**yourself** [2] - 3:11, 3:18